**Don L. PARR, Plaintiff,**

v.

**WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY, Defendant.**

**Civ. A. No. 83–52–ATH (WDO).**

United States District Court,
M.D. Georgia,
Athens Division.

April 2, 1987.

Joseph C. Nelson, III, Athens, Ga., for plaintiff.

Ginger S. McRae, Atlanta, Ga., for defendant.

OWENS, Chief Judge:

Plaintiff Don L. Parr filed his complaint against defendant Woodmen of the World Life Insurance Society alleging that in contravention of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and of 42 U.S.C. § 1981 the defendant on May 13, 1982, discriminated against him by refusing to hire him as a field representative because of his being married to a black woman. Defendant moved to dismiss the plaintiff's complaint for failure to state a claim. The motion was granted but upon appeal that ruling was reversed. *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888 (11th Cir.1986). The case then came on to be heard before the court without a jury. The evidence and all submitted by the parties having been considered, this constitutes the court's findings of fact and conclusions of law. Rule 52, Federal Rules of Civil Procedure.

*Findings of Fact*

1. Within 180 days of the occurrence of the acts complained of, plaintiff filed

charges of employment discrimination with the Equal Employment Opportunity Commission. Thereafter, plaintiff received a "Notice of Right to Sue" from said Commission entitling him to institute this civil action, which was filed within 90 days of receipt of said notice.

2. Plaintiff Don L. Parr is a white man who, since January 13, 1972, has been married to a black woman.

3. Plaintiff Parr was born in Jackson County, Georgia, on October 26, 1942. He attended Banks County High School in Homer, Georgia, through most, but not all, of the eleventh grade. Other than on-the-job training he has no further formal education.

4. From 1959 until late 1971 plaintiff Parr was employed as produce manager for two different food stores in Commerce, Georgia, and as produce manager and meat market manager of a third food store in Jefferson, Georgia. He began in 1959 at $40.00 per week, progressed monetarily, and in 1971 was earning $195.00 per week. From October, 1971, until April, 1972, he was self-employed as a brick mason earning about $200.00 per week; during that same period he also worked as a chef for the Commerce, Georgia, Holiday Inn. In April, 1972, he began work with Mumford, Inc. as a store manager and continued with that company until around July, 1975, earning between $175.00 and $250.00 per week. From July, 1975, until January, 1977, he owned and operated the D & M Grocerteria in Athens, Georgia, drawing $200.00 per week against his store profits.

5. In January, 1977, Mr. Parr went to work for Coastal States Life Insurance Company as a debit manager (route life insurance salesman) with responsibility for door-to-door selling of life insurance and collection of premiums; his debit included Barrow and Jackson Counties. Mr. Parr earned a base salary of $175.00 per week plus commission for a total of between $250.00 and $350.00 per week, out of which he furnished and paid for his own transportation. He left in August, 1979, because he "was spending more money driving ...

than [he] was making." Trial Transcript, p. 6.

6. For a short time Mr. Parr worked for Wabash Life Insurance Company selling mainly cancer insurance on a commission basis, and then in November, 1979, he went to work for Security Life Insurance Company as a debit life insurance salesman earning $250.00 per week and commission. He left Security in two to three months to earn more money and became employed by State Mutual Insurance Company as a debit agent on January 21, 1980. He remained in that job until February 23, 1981, when he resigned. Thereafter until the incident that is before the court, Mr. Parr again sold cancer policies for Wabash on a straight commission basis.

7. During his employment with State Mutual Insurance Company Mr. Parr "was paid $230 per week salary or draw for the period of time that he was supposed to accumulate funds in the pool."

The gross pay calculations of Mr. Parr, excluding his first 13 weeks of employment for which he was receiving a salary, show his weekly average for each month as follows:

FISCAL YEAR ENDING
JUNE 30, 1980

| MONTH | WEEKLY AVERAGE |
|---|---|
| April | $383.00 |
| May | 400.00 |
| June | 395.00 |

FISCAL YEAR BEGINNING
JULY 1, 1980 AND ENDING
JUNE 30, 1981

| MONTH | WEEKLY AVERAGE |
|---|---|
| July | $316.00 |
| August | 317.00 |
| September | 285.00 |
| October | 311.00 |
| November | 279.00 |
| December | 181.00 |
| January | 151.00 |
| February | 116.00 |

For the three months of the fiscal year ending June 30, 1980, plaintiff's average weekly paycheck during April, May and June was $393.00. Beginning with the fiscal year of the company in July of

1980, to and including the date of plaintiff's resignation, his average weekly paycheck was $209.00. This shows a reduction of almost 50% from one year to the next.

In comparing the last three months of his employment in December 1980 and January and February 1981 with the last three of the fiscal year ending June 30, 1980, there is a decrease from $393.00 to $150.00 in his average weekly paycheck, which represents a decrease of approximately 62% in his paycheck.

Plaintiff had a lapse percentage in policies that he had written of approximately 75%.

Of the 417 policies that plaintiff wrote while with [State Mutual], 75% or 315 lapsed, while only 16% of the policies which had been assigned to him by the company lapsed.

The plaintiff left his employment with [State Mutual] because he was not making enough money.

The plaintiff had no job prospects when he resigned from [State Mutual's] employment.

Defendant's Exhibit 6 (Findings of Fact, *Parr v. State Mutual Ins. Co.*, No. 82–313R (N.D.Ga. May 8, 1984)), pp. 5–8. From February 23, 1981, until May 10, 1982, when plaintiff Parr engaged the services of AAA Employment Services of Athens, Georgia to find him a job, Mr. Parr unsuccessfully sought employment with each of the following insurance companies and as to each contended, by filed EEOC charge, that he was denied employment and thus discriminated against because he is married to a black female:

(a) Life and Casualty Insurance Company; February or March, 1982.

(b) United Family Life Insurance Company; March and June, 1982.

(c) State Mutual Insurance Company; about March 1, 1982, Defendant's Exhibits 2, 5 and 6.

8. AAA Employment Service has an Athens, Georgia office in the same building in which defendant's Athens office is located. On May 10, 1982, plaintiff Parr went to AAA Employment Service, talked to Marilyn Head and filled out AAA's application form. Plaintiff's Exhibit 2. Vicki Wagner, another AAA employee, was also present but did not interview Mr. Parr.

9. Plaintiff Parr, in his testimony, described this visit to AAA as follows:

"Q. And tell—explain to the Judge what happened when you went to Triple A, what you did and what was said.

"A. Well, I had been to several places for employment and I had been turned down so I never have really believed in paying for a job but to get a job, and I—at that time, I really needed one, I did go to Triple A Employment to see if they could place me for a job. When I got there, I talked to a lady by the name of Vicki Wagner and I told her I was seeking a job. And she first of all asked me to fill out this application. After I filled out the application, she said that she would go through her files and try to find something that was suited for me. And I asked her to please make anyone that she set up an interview with me for, to make them aware that my wife was black because I needed a job and I didn't want to waste anyone's time, my time or her time, if anyone was prejudiced towards me for that reason. And she assured me that she would and she told me to call her in a couple of days and she would try to set something up for me.

"Q. did you call her back in a couple of days?

"A. Yeah, I called her back in a couple of days. Vicki wasn't there at the time I called back, there was a lady by the name of Marilyn, I don't remember what her last name was. She said that Vicki wasn't there but she had set me up an appointment with Woodmen of the World. And she asked me to come down and pick up the card so I could go up and be interviewed with Woodmen of the World."

Plaintiff's Exhibits 9 and 10.

10. Before plaintiff Parr visited AAA on May 10, Marilyn Head had talked to Walt Jordan, Area Manager of defendant Woodmen of the World, and learned that Woodmen was looking for experienced life insurance salespeople. In particular, she

was told Woodmen was looking for "middle-aged, settled" persons. (Head Deposition, p. 9). As a result, an interview for Don Parr with Walt Jordan of Woodmen was arranged.

11. Marilyn Head does not remember plaintiff Parr saying anything to her during the initial interview about his black wife. All she remembers is arranging the interview. (Head Deposition, p. 10).

12. Plaintiff Parr went back to AAA, signed for and picked up an interview appointment card. He was interviewed on May 14, 1982, at 10:30 a.m. by Walt Jordan of Woodmen of the World.

13. Plaintiff Parr, in testifying, described the interview as follows:

"Q. what happened when you went—who did you see at Woodmen and what went on with that? What did y'all talk about?

"A. I went up there and introduced myself and it was a gentleman by the name of Walter Jordan. I presume he was the Manager for Woodmen of the World. I gave him the card and we had approximately hour and a half, two hour interview.

"Q. What kind of things did y'all talk about, yourself, insurance business?

"A. Oh, we talked about the insurance business, what kind of experience I had, the type of debits I had serviced, type of insurance I had sold.

"Q. Did he give you any feedback about what he thought about your qualifications for working as an agent with Woodmen?

"A. Well, we discussed a lot of things. He asked me the type of debits that I had ran, if the type of debits I had ran kept me out late at night, what kind of areas I went into, if was an all-black debit or if it was an all-white debit, if it was 50/50, 60/40 and so forth. We talked about that and he said that, 'It seems like you're the fellow we're looking for because you're already licensed, you've got experience,' and he said that he desperately needed someone for the Jefferson, Commerce and Nicholson area. And he said that, 'You'll like working for Woodmen of the World because you don't have to worry about servicing with niggers.' He said, 'We do not sell to niggers, we do

not hire niggers,' and said 'You don't have to worry about trying to collect from niggers.'

"Q. Had he said anything to you that indicated he knew that you were married to a black person?

"A. No, he didn't.

"Q. Based on his comments, do you have any impression of whether or not he knew you were married to a black person?

"A. I don't think at the time that he did because common-sense would tell anyone that if he had've known, he wouldn't have made those remarks in front of me, he would've had the decency not to.

"Q. Did you fill out an application there, did he—as far as an application, what happened with that?

"A. No. He gave me an application and told me to take it home and fill it out and that he wanted me to come back on Monday for the second interview and I could bring the application with me when I came back."

Trial Transcript, pp. 10–12.

14. Walt Jordan, when asked about the same interview, testified:

"Q. Now, do you remember interviewing the plaintiff in this case, Don Parr?

"A. Yes.

"Q. Who contacted you about interviewing Mr. Parr?

"A. I believe Ms. Head called me on the telephone and said that she had somebody that was looking for this type of work and they had some experience in the business and, 'Would I like to talk to him?'

"Q. When was that that she contacted you about interviewing Mr. Parr?

"A. I don't know; it was sometime in May of 1982.

"Q. Describe for me again what she said during that telephone conversation.

"A. She said that she had somebody that may be interested in a job with the Woodmen of the World, and that they had had some experience in the insurance business, which I thought was a plus, and, 'would I be interested in talking to him?'

"Q. Did you talk to Mr. Parr?

"A. Did I talk to Mr. Parr? Yes.

"Q. Do you remember what date that was?

"A. No, not for sure; I think it was about mid-May '82.

"Q. How long did you talk with Mr. Parr that day?

"A. Best of my recollection, about a half an hour.

"Q. What did you all talk about?

"A. At first when he came in, he gave me a brief resume of what he had been doing, he expressed that he had worked for several life insurance companies which I knew to be debit insurance companies, I believe, Gulf Life, Coastal States, may have said something about Wabash or something like that, and that he was working, I believe, in a produce market or a produce department or something of that sort. And after he gave me that idea—those ideas, then I proceeded to show him what I referred to before as the LP-65 and that explains that from the beginning of it, that the Woodmen of the World is a fraternal benefit society, the membership is set up in local lodges or camps and they meet regularly and have suppers, do things for the community, the Woodmen itself has set up fraternal benefit fund that pays, should you have lung cancer, leukemia, brain tumor, Hodgkin's disease, lymph cancer, multiple myeloma, it'll pay up to $1,000, tuberculosis benefit of $3,000. Should your home be damaged by a storm, the Woodmen will pay up to $150 to help you repair the damage, pay for your insurance for up to six months, and then it goes into how the members are recommended by each member and then it goes into the insurance portion of it that I described to you before.

"Q. Now, going back to what Mr. Parr said about his employment with insurance debit companies, do you remember him describing that for you?

"A. No. I didn't ask him to describe it; I knew what it was.

"Q. Did he say anything about the routes he had worked in the past?

"A. The what?

"Q. Did he say anything about the debit routes he had worked in the past?

"A. No.

"Q. What did Mr. Parr ask about the job for Woodmen?

"A. What did he ask about it?

"Q. Yes.

"A. I honestly don't remember him asking really anything about it. The presentation that I gave him, perhaps answered any question that he might've had. He didn't really have—had very little to say.

"Q. *What did Mr. Parr say to you about his marriage?*

"A. *He told me that he had an interracial marriage.*

"Q. How did that subject come up?

"A. That subject came up after I had finished the presentation. I said to him, 'Do you feel like you would be able to present this to other people?' And he said, 'Yes.' And I flipped back through the presentation and said, 'You will notice that these are all white people in these pictures because the Woodmen of the World doesn't have any black members in the local camps here and they don't mess with picking up money or debit-type situation.' And then he said, 'Well, I have an interracial marriage.' And then I further explained to him that in the process of this business, you have to work very closely with the membership in order to obtain these leads, I might've used that word, or these recommendations. And that it would be very difficult with a black wife if the membership knew about it, very difficult for them to work with you and for you to be successful doing this. And after I explained that to him, he just shook his head and I told him, you know, 'You are welcome to apply for this job. You could probably get this job because of your experience and whatnot, but the difficulty factor is going to be much, much greater for you than it would be for anybody else,' and believe me, I was concerned about him being successful because his success would've been directly related to my success.

"Q. Did you give Mr. Parr an application?

"A. Yes, I did.

"Q. What did you tell him to do?

"A. I gave him an application and I gave him a Stuart Basic Factor's test and I believe, and I couldn't swear to this, but I believe I gave him a loan agreement contract to sign; that's the normal procedure, three pieces of paper. I gave them to him and told him, 'Fill these out at your leisure and call me back and we'll get together again.'"

Trial Transcript, pp. 85–89 (emphasis added).

15. When asked about what happened after the interview, Mr. Parr testified:

"Q. Did you go back by the Triple A office?

"A. I went by and stuck my head in the door because this Marilyn had asked me to come back and let her know how things went, but she—as well as I remember, she was busy with some—another client, I suppose, so I just kind of waved at her and left; I didn't even talk to her.

"Q. When was the next time you had occasion to talk with somebody about the job at Woodmen or talk with somebody at Triple A?

"A. It was on Monday. I supposed to have went back to Woodmen, I believe, about one o'clock on Monday for the second interview and to take the application back but I thought about this the whole weekend, the remarks that Mr. Jordan had made about, 'I wouldn't have to worry about selling or servicing to niggers.' I thought about that and I knew in my heart that he did not know my wife was black. So, the more I thought about it, the more that I thought that I should call Triple A so I called back down there to talk to Vicki Wagner because I had asked her to make anyone aware of that. So I called back and Marilyn answered the phone and said Vicki was not there. And I asked her if Vicki had made Mr. Jordan aware that my wife was black. She said no because Vicki didn't set the appointment up with Mr. Jordan, she had set the appointment up with him and that she did not make him

aware of the fact that my wife was black. So, I explained to her about the interview and I asked her, would she please go and talk to Mr. Jordan and inform him that my wife was black before I came down there at one o'clock for the interview, and to tell him, you know, that my wife was black and if he still wanted me to come down for the interview, that I would; if not, I wouldn't waste his time or my time.

"Q. Did you talk with her again that morning after that phone conversation?

"A. Well, she said that she would go and talk to him immediately and call me back. Probably an hour, maybe and hour and a half, she called me back and said that she had talked to Mr. Jordan, made him aware of the fact that my wife was black and Mr. Jordan had implied to her or told her that legally he could not stop me from filling the application out, turning it in and pursuing the job, but that he would suggest that I would drop it where it was at. Because my wife was black, it just wouldn't work out.

\* \* \* \* \* \*

"Q. Did your application with Woodmen go any further after that conversation from Marilyn Head?

"THE COURT: He never submitted an application.

"Q. MR. SWEAT: Did the application process go any further?

"THE COURT: You mean, did he do anything else?

"MR. SWEAT: Yes sir.

"A. Witness: No. After Marilyn called me back and stated that Mr. Jordan suggested that I drop the matter where it was at, I tore the application up, throwed it in the trashcan and didn't pursue it any further."

Trial Transcript, pp. 12–14, 16.

16. Marilyn Head, when deposed on December 28, 1983, testified about post-interview happenings as follows:

"Q. Did you speak with Mr. Jordan again, after the interview with Mr. Parr?

"A. Yes.

"Q. Do you remember anything about that conversation? Can you tell me what was said? First of all, did he call you or did you call him?

"A. I called him.

"Q. What did you say?

"A. I asked him how it was going and I don't really remember exactly what was said or exactly—

"Q. Well, tell me what you can remember. Did he tell you about what happened in the interview?

"A. This is the problem, I don't remember specifics, I do not remember specifics. I don't remember times or dates or specifics. I remember the incident, but not specifics. And to sit down and tell you we had a conversation, I can't specifically say that that actually happened then and there on the spot or that's the correct word.

"Q. Can you describe generally what was said in this conversation with Mr. Jordan after the interview? I mean, did he indicate any—what did he indicate about whether he was going to—whether Woodmen would approve Mr. Parr or not?

"A. I just don't remember. It seemed to me like that things were fine. It was good, but I just do not remember specifics.

"Q. Did he mention anything about Mr. Parr's marriage?

"A. I don't remember.

"Q. Did he mention anything about his other qualifications, whether they were satisfactory for the job or not?

"A. At some point, we talked about both of those things.

"Q. About both what things?

"A. His qualifications and his marriage.

"Q. So in this second interview—I mean, this second conversation after the interview, you did—

"A. See, I don't remember. I don't think it was that conversation.

"Q. Do you remember which one it was?

"A. No, I don't.

"Q. Do you know whether Mr. Parr had any other interviews with Mr. Jordan?

"A. No, I don't know.

"Q. You don't know?

"A. No, I don't know.

"Q. Did you speak with Mr. Parr after the interview?

"A. Yes.

"Q. Do you remember anything about that conversation?

"A. He was—

"Q. Did you call him?

"A. He was very unsure. No, *he came back into the office. I'm pretty sure he did,* and he seemed very unsure about it.

"Q. What do you mean?

"A. He didn't seem like—he didn't know how it was going to go. He seemed very unsure about how it would turn out.

"Q. What did he say to you to lead you to believe that he was unsure about it?

"A. Just, I'm not sure.

"Q. Did he say that—was there any reason that he thought that he might not be approved by Woodmen as a field representative, any specific reason or anything?

"A. It seems to me that *at that time he told me that his wife was black.*

"Q. So you think it was then? Is that the first time that you knew?

"A. *As far as I can remember, that's the first time I knew of it.*

"Q. Do you know why he told you that or in what connection he made that—disclosed that information to you?

"A. No. I don't remember and I'm not sure that this is the time that it happened.

"Q. Well, did he say that he thought that might be the reason that he wasn't—or he might not be approved by Woodmen?

"A. *That he had had trouble in the past.*

"Q. *That's what he said?*

"A. *Yes.*

"Q. Did you ever tell him that Woodmen of the World did not sell insurance to blacks or hire blacks as field representatives?

"A. I don't remember.

"Q. Did you have any information along those lines that you might have—

"A. Yes.

"Q. Where did you get that information?

"A. From the office of Woodmen of the World in the Butler Building.

"Q. Who told you that, in the office?

"A. Jerry and Walt, both, said that it was company policy.

"Q. Can you tell me when you—when were you told that information that you just told me by Mr. Jordan, do you remember?

"A. That was *some time afterward—after the interview.*

"Q. After the interview with Mr. Parr, that's the first that you knew about it?

"A. Right, yes.

\* \* \* \* \* \*

"Q. You said that—or *did you tell me that Mr. Jordan* was aware or *indicated to you that he was aware of Mr. Parr's marriage:*

"A. *Yes.*

"Q. He was?

"A. Yes

"Q. when did he indicate that to you?

"A. I don't remember. Sometime in the course of the conversations about the—

"Q. Was it *before the interview or after?*

"A. *After.*

"Q. Can you remember what he said about—

"A. Not specifically.

"Q. How about generally? Do you remember how it came up?

"A. No, no—just in conversation. He was talking in general about the applicant and about the situation and about hiring and not hiring.

"Q. *Did Mr. Jordan say that Mr. Parr told him that he had an inter-racial marriage* during the conversation—during the interview?

"A. *He must have if I knew about it.* If he told me about it. I don't know. I don't remember the specific conversation.

"Q. During that conversation, did you know about his inter-racial marriage or was that the first that you knew, when Mr. Jordan told you?

"A. I don't remember if I knew before then or not."

Trial Transcript, pp. 11–15, 16–17 (emphasis added).

17. At trial Marilyn Head's testimony was substantially different from her deposition testimony. She professed to then remember and what she remembered then supported plaintiff Parr's testimony. Her deposition testimony is more credible and more worthy of belief.

18. Mr. Jordan, as to post-interview happenings, testified:

"Q. What did you hear back from Mr. Parr?

"A. Fourteen months later, I heard about this case. That was the first thing I heard back. I never heard anything directly from Mr. Parr.

"Q. Did you talk with Marilyn Head from the Triple A Employment Service after your interview with Mr. Parr?

"A. After the interview, Mr. Parr, yes.

"Q. Do you remember when that was?

"A. No, but I do remember it was a length of time that was long enought for Marilyn to say, 'Hey, what's going on as far as the progress of Don Parr's employment with the Woodmen?' And I said, 'As far as I know, I haven't heard anything. Apparently he's decided not to continue.' And I think I even went into describing to her the difficulty factor for him would have been much higher than for someone else who did not have an interracial marriage.

"Q. Do you remember where that conversation with Ms. Head took place?

"A. I have a recollection of speaking with her in the parking lot of the Butler Building, which was where our offices were and either she was going to lunch or I was going to lunch or we were both going to lunch or one of us was coming back, I don't know, but I believe we just passed each

other in the parking lot and stopped briefly to talk about it.

"Q. Did you have any other conversations about Don Parr with Ms. Head?

"A. After that one?

"Q. Right.

"A. No.

"Q. Did she ever call you on the telephone and ask you about Don Parr?

"A. No, I don't think so."

Trial Transcript, pp. 89–90.

19. Woodmen of the World Life Insurance Society is a fraternal benefit society. It's president in a message to area managers, found in its manager's manual (Defendant's Exhibit 13), describes its functions as follows:

The Woodman is not a commercial life insurance company, but rather is and shall continue to be a fraternal benefit society. You are contracted field representatives, serving a vast fraternal membership of well over 875,000, with a legal reserve life and disability income portfolio without equal.

Distinctively, as a fraternal benefit society we have a lodge system, with a ritualistic form of work and a representative form of government, and operate not for profit.

It is imperative that we keep in balance the insurance and fraternity of this Society, for one is as important as the other. A person cannot be insured by the Woodmen without becoming a member, and conversely, one cannot become a member without being insured. Insurance and fraternity travel hand in hand in our Society, which gives it a more meaningful purpose in service to our vast and rapidly growing membership. The measure of your success may well be determined by your ability to keep in balance the fraternal and insurance programs.

Fraternally,
/s/
Nick T. Newberry
National President

1981

20. Woodmen employs state and area managers who are compensated on a salary plus override commission on all insurance sold by field representatives within their geographical area of responsibility.

21. The job that plaintiff Parr contends he desired is that of field representative. A field representative's job is to learn of prospective members from present Woodmen members, call on prospects and sell them on becoming members. All members must buy life insurance, for the sale of which the field representative receives a commission which begins at 50% of first year premiums for new field representatives. Second and subsequent years commissions are less. (Defendant's Exhibit 8, Field Representative's Contract). New field representatives sign a loan agreement under which they are advanced money to live on in multiples of six times sales; ultimately all advances or loans are repaid. Much is required of field representatives— see manager's manual—and all field representatives are paid only on a commission basis. Field representatives may not sell insurance for any company other than Woodmen.

22. On cross-examination before the court Mr. Parr testified:

"Q. Between a salary basis and a commission basis, you preferred some sort of salary or base, did you not?

"A. Correct.

"Q. You did not prefer or want to work on a straight commission basis, true?

"A. Well, not particularly. I had rather have some kind of base.

"Q. When you were under contract with Wabash, you were under strict commission?

"A. Correct.

"Q. And you didn't sell much for Wabash, did you?

"A. Not very much.

"Q. You didn't want Woodmen to know that you had a black wife, did you?

"A. No sir.

"Q. But despite the fact that you didn't want Woodmen to know you had a black

wife, you called Ms. Head and asked her to tell Woodmen that you had a black wife, is that correct?

"A. Well, now, I rescind what I just said previously. I asked Vicki Wagner to make anyone aware—anyone that she set an appointment up with me for, to make them aware that my wife was black. At the time that I was interviewed with Mr. Jordan, I knew that he wasn't aware of it and I—of course, I didn't tell him during the interview because I needed a job.

"Q. And despite that, you then made sure that Mr. Jordan knew your wife was black is that correct?

"A. After hearing some of the words that he used, I did.

"Q. Just so I make sure the Court understands the scenario, you initially wanted every employer that you spoke to to know your wife was black, correct?

"A. That's correct.

"Q. When you talked to Mr. Jordan, you then decided you wanted the fact that you had a black wife to be a secret, is that correct?

"A. No. I didn't want anything to be a secret.

"Q. Well, you didn't want Mr. Jordan to know your wife was black, is that correct?

"A. No. I didn't say that I didn't want him to know.

"Q. At the time you interviewed with Mr. Jordan, did you want him to know your wife was black?

"A. Well, I assumed that he knew it.

"Q. You assumed he knew it until the time he used the word, 'nigger,' is that correct?

"A. That's correct.

"Q. Then you knew that he—or felt confident that he didn't know?

"A. That's correct.

"Q. But you still chose not to tell him at that time?

"A. Well, I didn't see any point of telling him because I had assumed that he had been made aware of it. I wondered why he used those—that kind of language.

"Q. I don't mean to mischaracterize your testimony, Mr. Parr, but it was my understanding that you testified earlier that once Mr. Jordan used the word "nigger" you were then quite confident that he had no knowledge that your wife was black?

"A. That's correct.

"Q. And once you reached the conclusion that Mr. Jordan had no knowledge you had a black wife, you nonetheless chose not to inform him of that fact?

"A. That's correct.

"Q. In fact, you didn't want him to know, did you?

"A. It wasn't that I didn't want him to know; I needed the job.

"Q. And that's why you didn't want him to know cause you needed the job?

"A. It's not that I didn't want him to know, because I had informed Triple A to make anyone aware that my wife was black.

"Q. You, Mr. Parr, remember giving a deposition in this case some years ago, 1983, I believe?

"A. Yes.

"Q. Was your testimony at that time true and correct?

"A. Yes.

"Q. I'd like to direct your attention, if I could, to your deposition.

"MR. SWEAT: Your Honor, may we have a copy of the deposition.

"THE COURT: Sure.

"MR. SWEAT: I think it's up here with the file.

"Q. MR. WYMER: I'd like to direct your attention, if I could, Mr. Parr, to Page 128 of your deposition.

"A. Okay.

"Q. And specifically, beginning on Page 12—excuse me, Line 12 with the 'Question: Did you already have the application in your hand at that point? Answer: Yes. Question: Well, why didn't you just give it back to him? Answer: Well, I needed the job. Question: You would have been will-

**1032**

ing to go to work for Woodmen anyway? Answer: As long as I could have kept them from knowing, I would have.' Kept them from knowing what, Mr. Parr?

"A. If they would have gave me the job, I would have kept it from them, the fact that my wife was black, after I was hired in order to keep the job.

"Q. But before they could offer you the job, you called Ms. Head and made sure that they knew your wife was black, correct?

"A. That's correct."

Trial Transcript, pp. 23–27.

23. Mr. Jordan's testimony is more credible than Mr. Parr's testimony, both upon deposition and before the court.

24. Having had several jobs selling debit life insurance on a base salary plus commission—pay your own travel expense basis—and having left each of those jobs because he wasn't earning enough after paying expenses, Mr. Parr, when he went to AAA Employment Service and when he interviewed with Woodmen of the World, was not genuinely interested in becoming a paid by commission field representative for Woodmen.

25. In going to be interviewed by Woodmen, Mr. Parr's real purpose was to act like he was interested in becoming a field representative; to let it be known that he is married to a black woman; to not actually apply for the job; and to then claim as the basis of a Title VII charge and civil action that he was told applying would be useless since Woodmen wouldn't hire a white man with a black wife.

### Conclusions of Law

As in *Allen v. Prince George's County, Md.*, 538 F.Supp. 833 (D.Md.1982), plaintiff Parr has the burden of proving a prima facie case of racial discrimination, the elements of which under the *McDonnell Douglas Corp. v. Green* test, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 668 (1973) are:

(1) that he is a member of a protected class;

(2) that he applied for a job as field representative for defendant Woodmen of the World;

(3) that he was qualified for the job;

(4) that, despite his qualifications, he was not hired;

(5) that at the time he applied a job was open and defendant continued to seek application from persons of plaintiff Parr's qualifications.

Plaintiff Parr, by virtue of the decision of the Eleventh Circuit Court of Appeals, 791 F.2d 888, has proved that he is a member of a protected class. He has also proved that he was qualified for the job of field representative, was not hired and defendant Woodmen continued to seek applications from persons of his qualifications. He has not, however, begun to prove that he applied for the job of field representative.

When Mr. Parr went to AAA Employment Service and on to Woodmen of the World's Athens, Georgia office to be interviewed, he was not genuinely interested in becoming a paid on commission only field representative for Woodmen of the World. He was interested in creating a basis for EEOC charges and this Title VII lawsuit. Consistent with that purpose, Mr. Parr never actually applied for the job of field representative.

A plaintiff whose primary purpose in interviewing for a job is to create the basis for a Title VII EEOC charge and lawsuit, is not the bona fide applicant for a job that he must be to establish a prima facie case.

Even if plaintiff Parr had filled out and submitted an application for employment as field representative to Woodmen and even if plaintiff Parr had then not been hired, he, in this court's considered judgment, would be nothing more than a test plaintiff who never intending to accept employment with Woodmen, he has not been—could not have been—damaged by their failure to hire. " 'Test' plaintiffs are not ... harmed by a refusal to hire since they are not seriously interested in the job for which they apply ..." *Sledge v. J.P.*

*Stevens & Co., Inc.,* 585 F.2d 625, 641 (4th Cir.1978).

As Circuit Judge Borman in *Lee v. Cone Mills Corporation,* 438 F.2d 86, at 90 (4th Cir.1971), observed:

In short, this entire case smacks of nothing but ... [litigation manufactured by plaintiff Parr] with [counsel for Mr. Parr] serving merely as puppets or pawns in [Mr. Parr's] game....

█ Plaintiff Parr has failed factually and legally to prove that defendant Woodmen of the World Life Insurance Society is liable to him for employment discrimination. Judgment will be entered for the defendant and against the plaintff as to his claims under Title VII and § 1981.