## MARYLAND MINORITY CONTRACTOR'S ASSOCIATION, INC., et al.

v.

## MARYLAND STADIUM AUTHORITY, et al.

### No. Civ.A. CCB–97–513.

United States District Court,
D. Maryland.

Sept. 30, 1998.

582

John H. Rhines, Stancil & Rhines, Baltimore, MD, for plaintiff.

Maureen Dove, Assistant Attorney General, Baltimore, MD, for defendant.

**MEMORANDUM**

BLAKE, District Judge.

This case arose during the construction of the Baltimore Ravens football stadium ("stadium"), which has now been completed, in time for the 1998 football season. At issue are alleged racially discriminatory contracting practices of the defendant Maryland Stadium Authority ("MSA"), and the constitutionality of the Maryland Minority Business Enterprise affirmative action statute, Md.Code Ann, State Fin. & Proc. §§ 14–301 to 14–309 (1995 & Supp. 1997) ("MBE statute").

The plaintiffs, Maryland Minority Contractors Association, Inc. ("MMCA"), and three of its member contractors ("individual plaintiffs"), allege civil rights violations under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1981 (prohibiting racial discrimination in the award of contracts), § 1982 (prohibiting racial discrimination in the transfer of property), § 1983 (prohibiting state action depriving a person of a federally-protected right) and § 1985(3) (prohibiting conspiracies to deprive a person of a federally-protected right).[1] All of the statutory claims turn in substance on the existence, or not, of an equal protection violation, and it is sufficient for purposes of deciding this motion to focus on that element without delving into the differences between these statutory claims. MMCA sued the Maryland Stadium Authority and nine of its top board members and employees (collectively "MSA", "state defendants", or "defendants") for declaratory relief; in their official capacities for prospective injunctive relief; and in their personal capacities for damages. Also, the plaintiffs originally named but have since voluntarily dismissed private defendants Clark Construction Group, Inc. ("Clark"), prime contractor for stadium concrete erection; Whiting Turner/Barton Marlow/Essex joint venture

1. The complaint also mentions but fails to allege violations of the Thirteenth and Fifteenth Amendments. Accordingly, those claims are stricken. Additionally, the plaintiffs' request for a permanent injunction prohibiting the award of the concrete and electrical prime contracts to certain contractors is now moot. (Compl.¶ 64(8).)

("joint venture"), construction manager for the stadium; and Gary C. Harkness, project director for the joint venture.

On March 27, 1997, this court denied the plaintiffs' request for a temporary restraining order or preliminary injunction halting various aspects of the stadium's construction. Now pending is the state defendants' motion for dismissal of the complaint on the grounds of lack of standing under Fed.R.Civ.P. 12(b)(1), failure to state a claim under Rule 12(b)(6), and Eleventh Amendment immunity; and for summary judgment on the issues of qualified immunity and discriminatory motive.[2] Before filing their opposition, the plaintiffs moved for continuance under Fed.R.Civ.P. 56(f), alleging they could not respond to the defendants' motion because of inadequate time and opportunity to conduct discovery. On August 28, 1997, this court denied the motion for continuance, holding that discovery was not necessary to address the questions of standing, failure to state a claim, and Eleventh Amendment immunity, "as any relevant factual and legal information should already be in the plaintiffs' possession. Discovery on the other issues raised by the defendants also is not necessary so long as these issues are considered in the context of Rule 12 rather than Rule 56." (Ct.'s Mem. Aug. 28, 1997.) Accordingly, this motion will be treated only as a motion to dismiss. Briefing is now complete, and no hearing is deemed necessary. *See* Local Rule 105.6. For the reasons that follow the motion will be granted.

### BACKGROUND

Plaintiff MMCA is a private nonstock Maryland corporation whose "chief purpose and mission is to fight against, and to eradicate racial prejudice, exclusion and discrimination against African–American and Hispanic persons who are engaged in the construction business in Maryland, and to promote, enhance, protect and preserve said persons' business and economic interests." (Compl.¶ 1.) The other three plaintiffs are natural persons who are both members of MMCA and residents of Maryland: Richard J. Colon, a Hispanic electrical contractor, president of Mace Electric Co., Inc.; Pless B. Jones, an African–American demolition, excavation, concrete erection, masonry and paving contractor, president of P & J Contracting Co.; and Robert A. Harris, an African–American general construction, excavation, paving, demolition, concrete erection and trucking contractor, president of B.A. Harris Construction, Inc. (Compl.¶¶ 2–4.) These plaintiffs will be referred to in this opinion by their company names for ease of discussion. The plaintiffs allege that this is a class action, (Compl.¶ 18), but have not yet moved for class certification.

Defendant M.S.A. § is a public corporation created by the Maryland General Assembly pursuant to the Maryland Stadium Authority Act, 1986 Md.Laws ch. 283, codified as amended at Md.Code Ann., Fin. Inst. §§ 13–701–13–724 (1992 & Supp. 1997). (Compl.¶ 5.) Additionally, nine M.S.A. § board members and employees are sued in their official capacities for prospective injunctive relief, (Compl.¶¶ 6–14), and in their personal capacities for damages.

Briefly stated, the plaintiffs allege the following claims:

Counts 1 and 4 allege that the MSA's use of bidder prequalification for large construction contracts is racially discriminatory, and excludes firms owned by African–Americans and Hispanics from bidding on these contracts.

Counts 2 and 5 allege discrimination in Clark's letting of a concrete subcontract to a white-owned firm which was not the lowest bidder, over an Asian Indian-owned firm with the lowest bid.

---

**2.** A final defendant, Harris Rebar Atlantic, Inc., is named only in count 6 but has not moved for dismissal. (It is not clear whether Harris has been served). Because count 6 will be dismissed, however, Harris Rebar will be dismissed as well.

Count 3 alleges that the MBE statute is unconstitutional on its face for overinclusiveness, because it includes women, other minorities, and firms from out of state against whom no findings of past discrimination in the Maryland construction industry have been made; and as applied because the MSA's fulfillment of MBE goals by granting contracts to white women is a mere pretext for racial discrimination against the plaintiffs.

Count 6 alleges that a subcontract between Clark and Genesis, a certified MBE owned by an African American (who is neither a named plaintiff nor alleged to be a member of MMCA) illegitimately counted some $2 million of material purchased by Genesis from a white-owned firm toward fulfillment of MBE goals.

## ANALYSIS

### I. *Standing*

The Fourth Circuit has explained that:

When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.; Trentacosta v. Frontier Pacific Aircraft Indus.,* 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Trentacosta, supra,* 813 F.2d at 1559 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Trentacosta, supra,* 813 F.2d at 1558.

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991).

The Supreme Court has interpreted the "case or controversy" language of Article III of the Constitution to require a party seeking to invoke a federal court's jurisdiction to demonstrate three things: (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (citations, footnote, and internal quotation marks omitted); (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court," *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976); and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative," *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325. These elements are the "irreducible minimum," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), required by the Constitution.

*Northeastern Florida Contractors v. City of Jacksonville,* 508 U.S. 656, 663–64, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993) (*"Florida Contractors"*). Even where this constitutional minimum is met, prudential limitations may limit standing, for example, to assert generalized grievances or the rights of third parties. *See Warth v. Sel-*

*din,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

██ An association or organization may have Article III standing under either of two distinct theories. First, it may have standing in its own right, which conclusion is arrived at through the same analysis as individual standing. *Maryland Highways Contractors v. State of Md.,* 933 F.2d 1246, 1250 (4th Cir.1991) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982)). Second, it may have representational standing. *Warth,* 422 U.S. at 511, 95 S.Ct. 2197. Under the three-part test set forth in *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), an organization has representational standing when (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit. *See Maryland Highways Contractors,* 933 F.2d at 1251.

### A. *Counts 1 and 4*

██ Counts 1 and 4 allege that the three individual plaintiffs stood ready and able to submit bids on the prime contracts but were prevented from doing so because of the bidder prequalification requirement. This alleged denial of a chance to compete is clearly sufficient to satisfy the "injury in fact" prong, and the plaintiffs are not required to allege that they would have received the contracts but for the alleged discrimination. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Florida Contractors,* 508 U.S. at 666, 113 S.Ct. at 2303. MSA argues that there was no injury in fact because the plaintiffs were prevented from bidding, if at all, only because of an objectively reasonable business motive, not racial discrimination. This argument is inappropriate to address in the context of standing, however, as it goes to the merits of the plaintiffs' claims (it will be discussed later in the appropriate, Rule 12(b)(6), context). *See Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 ("standing in no way depends on the merits of the plaintiff's contention"). MSA makes similar and equally unavailing arguments regarding the causation and redressability elements, which present no obstacles here. As the Court in *Florida Contractors* explained, "[i]t follows from our definition of 'injury in fact' that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of the injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury." 508 U.S. at 666 n. 5, 113 S.Ct. at 2303 n. 5.

██ Because the individual plaintiffs have standing, it is unnecessary to decide whether MMCA also has standing in a representational capacity. The individual plaintiffs would be entitled to the same injunctive and declaratory relief sought by MMCA if they prevail. *See Spann v. Colonial Village, Inc.,* 899 F.2d 24, 29 n. 2 (D.C.Cir.1990) (Ginsburg, R.B., J.) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977) (holding that because one plaintiff, who sought only injunctive relief, had standing to assert its own rights, the Court need not consider the standing of other plaintiffs)). MMCA also claims that it has standing to assert a damages claim on its own behalf, alleging that it has "expended over $10,000 of its corporate funds to fight against defendants' unlawful racially discriminatory contracting policies and practices, complained of herein." (Compl.¶ 1.) While this would seem to satisfy the constitutional injury-in-fact requirement, prudential limitations counsel against a finding that MMCA has standing to assert a violation of another's rights, a situation commonly called third-party standing. MMCA claims that *Havens Realty Corp. v.*

*Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982), supports standing here, but in that case the Supreme Court addressed a claim brought under the Fair Housing Act. Recognizing its previous holding in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n. 9, 109, 99 S.Ct. 1601, 1609 n. 9, 1612, 60 L.Ed.2d 66 (1979), that Congress in the Fair Housing Act intended to confer standing to the limits of Article III, and thus prohibited the application of judicially-created prudential limitations on standing for such claims, the Court in *Havens* limited its inquiry to the constitutional standing requirements posed by Article III. *Havens*, 455 U.S. at 372–73, 102 S.Ct. at 1120–21. By contrast, the claims here are brought, not under the Fair Housing Act, but under §§ 1981, 1982 and 1983 of the Civil Rights Act of 1871. "[T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Article III's minimum requirements, serve to limit the role of the courts in resolving public disputes." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (reviewing prudential standing principles in context of case alleging violations of §§ 1981, 1982 and 1983). "Unlike the Fair Housing Act, Sections 1981 and 1982 do not create a statutory right which confers standing even where plaintiff would otherwise have no judicially cognizable injury. Therefore, the Court is not required to extend standing under Sections 1981 and 1982 to the full limits of Article III and may invoke prudential limitations." *Saunders v. General Services Corp.*, 659 F.Supp. 1042, 1054 (E.D.Va.1987) (citing *Warth*, 422 U.S. at 513–14, 95 S.Ct. at 2212–13); *cf. Williams v. Poretsky Management, Inc.*, 955 F.Supp. 490, 494 (D.Md.1996) ("[A]n organization has standing under the Fair Housing Act when it demonstrates that it has: (1) devoted significant resources to identifying and counteracting the defendant's discriminatory practice; and (2) such practices have frustrated the organization's efforts against discrimination.").

Accordingly, the inquiry here must progress farther than that undertaken in *Havens*. Many judicial opinions have discussed third-party standing under the Civil Rights Act of 1871, but in each instance of which this court is aware there existed some relationship or associational tie between the putative plaintiff and the third party whose rights were violated, or there were serious obstacles to the third party's ability to bring suit on her own behalf. *See, e.g., Sullivan v. Little Hunting Park*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) (holding under § 1982 that white homeowner who rented home to African–American tenant had standing to contest refusal of neighborhood association to allow transfer of his share in the association to the tenant); *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989) (explaining that the prudential standing analysis in constitutional cases "look[s] at three factors: the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third party interests"). Moreover, the Fourth Circuit has limited third-party standing under the Civil Rights Act of 1871 to situations where the plaintiff is essentially the " 'only effective adversary' of the unlawful racial discrimination." *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 422 (4th Cir.1984) (sections 1981 and 1982); *cf. Scott v. Greenville County*, 716 F.2d 1409, 1414–16 (4th Cir.1983) (holding real estate developer, prevented from constructing low income housing by threats of zoning changes stemming from opposition to the coming of black renters to neighborhood, had standing under § 1983 where there would have been no potential black plaintiffs because the apartments had never been constructed or offered for rent); *see also Clifton Terrace Assoc. v. United Tech.*, 929 F.2d 714, 721 (D.C.Cir.1991) (holding corporate developer of low income housing project had no standing to assert

§§ 1981 and 1982 claims based on discrimination against current residents where those residents were plainly identifiable).

In this case, there exists no obstacle to a lawsuit by the parties whose rights were allegedly violated by the prequalification requirement, as those parties are themselves plaintiffs and, as held previously in this opinion, have standing to assert their own claims. Consequently, MMCA can have no standing to sue for injuries to itself flowing from the alleged violation of co-plaintiffs' civil rights. *See Mackey,* 724 F.2d at 422. The *Mackey* case well illustrates the difference between the standing inquiries under the Civil Rights Act of 1871 and the Fair Housing Act, for, after holding that the plaintiff had no standing to assert the rights of third parties under §§ 1981 and 1982, the court held that standing was proper under the Fair Housing Act because prudential limitations on standing do not apply under that statutory scheme. Following *Havens,* the court concluded that the "plaintiff has alleged an economic injury to himself, satisfying the Article III requirement, and that is all that need be shown." *Id.* at 423; *cf. Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992) (holding prudential limitations on standing precluded plaintiff from asserting constitutional right to travel of others, where she neither identified any obstacle preventing others from asserting claims on their own behalf nor any "special relationship with those whose rights she seeks to assert, such that we might overlook this prudential limitation").

Thus, the individual plaintiffs have standing to assert their own claims pertaining to MSA's bidder prequalification requirement; it is unnecessary to decide whether MMCA would have standing in its representative capacity since it would be entitled to no different relief than the individual plaintiffs; and MMCA does not have standing in its own right to claim damages to itself flowing from the violation of the rights of third parties.

### B. *Counts 2 and 5*

■ Although directed mainly toward the actions of Clark (which has been voluntarily dismissed), counts 2 and 5 also allege that Clark acted "in close concert with defendant M.S.A. § and its top executive staff" including several of the named individual state defendants. (Compl. ¶ 32; *see also* ¶¶ 53.) Under the liberal federal pleading rules these counts may be construed to allege civil rights violations by M.S.A. § and the individual state defendants, as these defendants have in fact construed the claims. The allegations concern a subcontract let by Clark, the prime concrete contractor, to Dyna Corporation, a white-owned firm which allegedly did not have the lowest bid. The firm with the lowest bid allegedly was Metro Ready Mix, Inc., an Asian–Indian–owned firm. (Compl. ¶ 34.) Additionally, the plaintiffs claim that an MBE firm, D & G Brice, was refused documents and information necessary to submit its most competitive bid. D & G Brice is not, however, a named plaintiff in this case, nor is it alleged to be a member of or associated in any way with MMCA.

■ Regarding standing both for the individual plaintiffs and associational standing for MMCA in its representative capacity, no named plaintiff or member of MMCA is alleged to have bid or attempted to bid on this particular subcontract. In essence the allegation concerns the loss of a benefit that was never sought by any plaintiff. Clearly then, the injury-in-fact prong of the standing inquiry has not been met. *See Lujan,* 504 U.S. at 564, 112 S.Ct. at 2138 (holding no injury-in-fact where plaintiff seeking injunctive relief had no plans to visit areas alleged to have been harmed by violations of environmental laws). Regarding associational standing for MMCA in its own right, the alleged denial of the subcontract to low bidder Metro Ready Mix, an Asian–Indian–owned firm cannot be said to have harmed MMCA, as MMCA by its own assertion is

concerned only with racial prejudice against African–American and Hispanic contractors, and no other groups, and its claimed injury-in-fact is to its efforts to eradicate discrimination against these two groups, not Asians or Indians. (Compl.¶ 1.)

 The allegation concerning the withholding of bid documents from D & G Brice, which, while an MBE, is neither a plaintiff nor member of MMCA, does not constitute sufficient injury in fact to support standing for any plaintiff. And even if it did, as with counts 1 and 4 prudential limitations preclude third-party standing, for there is simply no indication that D & G Brice faces any barrier to suing on its own behalf, nor is there any indication of a special relationship between D & G and MMCA or the individual plaintiffs.

Accordingly, counts 2 and 5 will be dismissed.

### C. *Count 3*

 Count 3 alleges the loss of opportunities by the plaintiffs to compete on an equal footing because the MBE statute is overbroad and is administered as a pretext for discrimination against the plaintiffs. As in *Florida Contractors*, these allegations suffice to create standing for the three individual contractor plaintiffs. 508 U.S. at 666, 113 S.Ct. at 2303. Prudential limitations, however, preclude third-party standing for MMCA in its own right to assert a damages claim.

 As to representational standing for MMCA, while the first two prongs of the *Hunt* test appear satisfied (injury-in-fact to one or more members and germaneness), standing on that basis is nevertheless precluded because of the potential for conflicts among its members—many of whom may actually benefit from the MBE statute. In *Maryland Highways Contractors* the Fourth Circuit held that a contractors' association composed of both minority and nonminority members failed the third prong of the *Hunt* test because there ex-

isted "actual conflicts of interest which would require that the individual members come into the lawsuit to protect their interests." 933 F.2d at 1253. While MMCA, according to its complaint, has only African–American and Hispanic members, it is obvious that many of them may be certified MBEs who benefit from the MBE statute—a point that MMCA concedes at page 17 of its opposition—and nothing in the complaint serves to dispel this conflict. The plaintiffs have provided no indication of how the decision to attack the MBE statute was made, or of how much support for the suit exists within the membership of MMCA. Indeed, out of over 100 members, only three are named or mentioned in the complaint. " 'It is entirely conceivable ... that many members of [MMCA] would oppose this litigation on ideological grounds or even because they are the beneficiaries of the Act's affirmative action provisions.' " *Id.* (quoting *Mountain States Legal Foundation v. Dole,* 655 F.Supp. 1424, 1431 (D.Utah 1987)); *see also Associated General Contractors of North Dakota v. Otter Tail Power Co.,* 611 F.2d 684, 691 (8th Cir.1979) (holding interests of association's members too diverse to satisfy third prong of *Hunt* test). The claim that the statute has been administered unfairly requires a slightly different analysis from the claim of facial invalidity but leads to the same conclusion of no representational standing for MMCA. Again under the third prong of the *Hunt* test, a claim of unfair administration would require the participation of individual members of the association. *See Rent Stabilization Assoc., v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993) (denying standing to association of landlords seeking only injunctive relief for as applied challenge to city ordinance alleged to violate takings clause where the court "would have to examine the details of each particular instance of poor administration").

Thus, the individual plaintiffs have standing to attack the MBE statute and its administration, but MMCA does not.

## D. *Count 6*

 Count 6 alleges a conspiracy under 42 U.S.C. § 1985(3) and violation of the equal protection clause of the Fourteenth Amendment, as well as §§ 1981, 1982 and 1983. Clark allegedly was required, in its prime concrete contract with MSA, to subcontract 30% of the work to MBE firms. Clark did contract with an MBE firm for a $4,425,583 reinforcing steel subcontract, but roughly half of that amount included materials purchased from a non-MBE firm, defendant Harris Rebar Atlantic, Inc. According to the plaintiffs, the use of this amount in fulfillment of MBE goals constitutes an unlawful conspiracy between Clark, Harris Rebar, and various of the state defendants. Nowhere, however, do the plaintiffs allege that they or any member of MMCA attempted to compete for this rebar subcontract. Accordingly, none of the plaintiffs has alleged the requisite injury-in-fact for standing to assert this claim.[3]

## II. *Failure To State A Claim*

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). When ruling on a 12(b)(6) motion, the court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's factual allegations, as well as all reasonable inferences therefrom, as true. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993); *Martin*, 980 F.2d at 952; *Westray v. Porthole, Inc.*, 586 F.Supp. 834, 836 (D.Md.1984). Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994); *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir.1995) (affirming Rule 12(b)(6) dismissal with prejudice because plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law); *Faulkner Adver., Inc. v. Nissan Motor Corp.*, 945 F.2d 694, 695 (4th Cir.1991) ("self-serving, inaccurate legal conclusions cannot rescue a factually deficient complaint").

## A. *Discriminatory use of Bidder Prequalification—Counts 1 & 4*

 Counts 1 & 4 allege that the bidder prequalification requirement is discriminatory as applied to "certain large and lucrative M.S.A. § construction contracts," reasoning that "[b]ecause [p]laintiffs and members of plaintiffs' class tend to be small businesses which employ few full-time accountants and administrative staff necessary to efficiently comply with defendants' contractor prequalification process, they are less positioned and capable of complying with defendants' contractor prequalification process, and thus, are discouraged and precluded from bidding or otherwise disqualified from bidding on defendants' construction projects." (Compl.¶ 22.) The plaintiffs further allege that the prequalification requirement is arbitrary, unnecessary and serves no legitimate purpose, but was implemented solely to discriminate. (*Id.*) The defendants explain and the plaintiffs do not contest that the "large" contracts referred in the complaint are the prime stadium contracts, of which there are three—concrete, electrical

---

**3.** In any event, count 6 appears only to allege a breach by Clark of its contract with MSA, and not violation of a federally-protected right such as equal protection which is required to state a claim under § 1985(3). A dispositive holding on that issue, however, is unnecessary.

and mechanical, as opposed to smaller sub-contracts under those prime contracts. These allegations fail to raise an inference of discrimination, for as the Court in *Croson* explained, standing alone they allege only "nonracial factors which would seem to face a member of any racial group attempting to establish a new business enterprise, such as deficiencies in working capital, inability to meet bonding requirements, unfamiliarity with bidding procedures, and disability caused by an inadequate track record." *Croson,* 488 U.S. at 498–99, 109 S.Ct. at 724.[4] Ensuring that a contractor has the resources and capital to complete a job is not an irrational goal, and there are no circumstances pleaded in the complaint which might give rise to an inference that the prequalification requirement, while objectively reasonable, has been used as a pretext for discrimination.

 Because intentional discrimination is prerequisite to an equal protection violation, the complaint must give rise to an inference of such motivation in order to survive a motion for dismissal under Rule 12(b)(6). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976); *see also Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 268–69, 97 S.Ct. 555, 565–66, 50 L.Ed.2d 450 (1977) (explaining that inference of intentional discrimination may arise from circumstances such as the "historical background of the decision, ... particularly if it reveals a series of official actions taken for invidious purposes, ... [the] specific sequence of events leading up the challenged decision, ... [d]epartures from the normal procedural sequence, [and s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"). A finding that a governmental body's "decision carried a discriminatory 'ultimate effect' is without independent constitutional significance." *Id.* at 271, 97 S.Ct. at 566.

 Attached to the complaint is an uncompleted copy of the prequalification form, which was created by the American Institute of Architects. It requests information such as work history, including size and type of jobs completed, financial status, banking and vendor references, bonding capability and insurance coverage. (Compl. Ex. 1, AIA Document A305, Contractor's Qualification Statement, 1986 Edition.) In response, M.S.A. § has included a copy of a contractor prequalification form submitted on February 28, 1996 by plaintiff Mace Electric for another M.S.A. § project (MSA claims it cannot locate the Ravens' stadium prequalification statement submitted by Mace), showing that in 1995 its bonding limit was $3,000,000 per job, and $17,000,000 in the aggregate. (Def.'s Ex. 8a at 22.)[5] Mace also

---

4. While some of the plaintiffs are not, strictly speaking, new businesses, they do claim hardship in breaking into the prime contractor as opposed to subcontractor market, and thus fit within the reasoning of this passage.

5. When a plaintiff's complaint relies on documents not provided with that complaint, the defendant may on a motion to dismiss provide them for the court's consideration. "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Weiner v. Klais and Co., Inc.,* 108 F.3d 86, 89 (6th Cir.1997). The court in *Weiner* reasoned that "[a]lthough plaintiff maintains that the complaint referred only to the 'plan' as an entity and not to the 'plan documents,' his claims are based on rights under the plans which are controlled by the plans' provisions as described in the plan documents." *Id.* Similarly, in challenging the prequalification requirement as arbitrary, the plaintiffs here cannot withstand a motion to dismiss by merely failing to provide the court with information provided to M.S.A. § in response to its prequalification requirement, information allegedly "not designed to test or measure contractors' skills, qualification or financial strength" but rather "used for the sole purpose of" discrimination. (Compl.¶ 22.) *See also Venture Assoc. v. Zenith Data Systems,* 987 F.2d 429, 431–32 (7th Cir.1993) (holding documents central to plaintiff's claim because they "constitute[d] the core of the parties' contractual relation-

lists 16 representative contracts it has acquired since 1989, the largest one being $3,251,354. (*Id.* at 8–9.) Mace's net worth on March 31, 1995 is listed on its balance sheet as $3,491,196, up from $2,581,361 in 1994. (*Id.* at 12.) Additionally, Mace lists a $2,400,000 contract from M.S.A. § for Oriole Park at Camden Yards, completed April 1992. (*Id.* at 18.) According to the complaint, the prime electrical contract for the stadium, which Mace claims to have been denied, was let in 1996 for $17,000,000. (Compl.¶ 23(7).) Given these circumstances, the above-quoted reasoning from *Croson*, the fact that Mace has contracted with M.S.A. § in the past for a substantial sum, and the plaintiffs' own claim that prequalification poses a barrier at least in part because they and their class tend to be smaller companies, no claim for relief has been stated. It would require sheer speculation to conclude based on these allegations that a company whose largest project and bonding capacity are less than 20% of the contract price was denied an opportunity to bid because of discrimination. Additionally, although the plaintiffs allege that "a bidder on [other] state contracts need only to post bid and performance bonds as evidence of its prequalification and fitness to perform on state contracts," (Compl.¶ 22), they have not alleged that even by these standards they would have been qualified for the $17,000,000 electrical prime contract, which presumably would have required a bond of more than five times Mace's bonding capacity.

Similarly, the defendants have attached a prequalification statement completed by

P & J contracting for now-dismissed defendant Whiting–Turner showing that P & J's bonding capacity was $5,000,000, and the largest job ever completed was for $3,200,000. (Def.'s Ex. 7.) The prime concrete contract was let for $32,500,000, to Clark. (Compl.¶ 23(9).) As with Mace Electric, the allegations pertaining to discrimination by use of the prequalification requirement fail to raise an inference of discrimination.[6]

The plaintiffs may well contend that the reason many minority contractors are smaller than they might otherwise be and thus less able to compete for large contracts is rooted in this country's history of race relations. That history, according to the Supreme Court, when supported by specific findings of discrimination by a governmental body, may support affirmative action statutes like the one at issue in count 3. *See generally City of Richmond v. Croson*, 488 U.S. 469, 509–11, 109 S.Ct. 706, 730–31, 102 L.Ed.2d 854 (1989) (plurality opinion) (discussed below in section II.B of this opinion). While it may or may not have been permissible for M.S.A. § to have waived certain prequalification requirements for minority contractors (an issue not decided here), the facts pleaded and relied upon in the complaint, considered together with the reasonable inferences favoring the plaintiffs that follow, do not suffice to show, even if proven, that M.S.A. § was required to forego prequalification of such bidders on the stadium's prime contracts.

Accordingly, counts 1 and 4 will be dismissed for failure to state a claim of intentional discrimination.

---

ship" could be considered on motion to dismiss although not provided by plaintiff); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) (holding in securities fraud cases that disclosures required by securities laws to be filed by defendant with the Securities and Exchange Commission may be considered on motion to dismiss, although not attached to plaintiff's complaint).

**6.** The defendants claim that the third individual plaintiff, B.A. Harris Construction, did not

attempt to prequalify for a prime stadium contract (at least they have no record of such attempt), and the plaintiffs have neither pleaded otherwise nor contested this assertion. The plaintiffs also list a number of other M.S.A. § contracts they claim have gone to white-owned firms, but have pleaded no facts or circumstances creating an inference of discrimination influencing their award. (Compl.¶ 23.)

### B. *The Maryland MBE Statute— Count 3*

Count 3 alleges that the Maryland MBE statute, Md.Code Ann., State Fin. & Proc. §§ 14–301–309 (1995 & Supp.1997) (cited hereafter as " § __"), is unconstitutional on its face because it is overinclusive, and further, that regardless of its constitutionality M.S.A. § has used it as a pretext for discrimination against African–American and Hispanic contractors by granting contracts to firms owned by white women in fulfillment of MBE goals.

The plaintiffs seek invalidation of the statute, damages from the individual state defendants sued in their personal capacities, and a race-conscious remedy requiring the M.S.A. § to set aside a minimum of 15% of its total yearly engineering and construction contracts for award exclusively to African–American and Hispanic-owned firms identified as victims of MSA's discriminatory policies.[7]

The history of the MBE statute up to 1990 was set out by the Fourth Circuit in *Maryland Highway Contractors*, 933 F.2d at 1248–49. Briefly, in 1978 the Maryland General Assembly adopted a statutory and regulatory scheme designed to encourage participation by MBEs certified by state law and to provide a fair share of contracts to MBEs for the procurement of supplies and services. In 1990, the General Assembly repealed the statute and replaced it with a new and revised version which attempts to comply with the Supreme Court's holding regarding MBE statutes in

*City of Richmond v. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The court in *Maryland Highways Contractors* wrote:

> In *Croson*, the Supreme Court held that a state or municipality must show that it had actually discriminated against minority groups before it could enact remedial legislation. 488 U.S. at 492, 109 S.Ct. at 720. The Court explained:
>
>> While the states and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use raceconscious relief.
>
> 488 U.S. at 504, 109 S.Ct. at 727.

*Maryland Highways Contractors*, 933 F.2d at 1249 n. 2. Consequently, Maryland commissioned a Minority Business Utilization Study, held legislative hearings, and determined that Maryland had engaged in discrimination against certain groups. *Id.* at 1249 (citing 1990 Md.Laws Ch. 708, preamble). "As a result of the study, the Maryland legislature enacted a new MBE statute protecting those classes of minorities which the study showed Maryland had discriminated against: American Indians; Asians; Blacks; Hispanics; women; and physically or mentally disabled individuals. Md.State Fin. & Procurement Code Ann. S14–301(f) (1990)." *Id.*

---

7. The plaintiffs also claim they have been stigmatized with a badge of inferiority by the racial classification employed in the MBE statute. (Compl. ¶ 42; Pl.'s Opp. at 22–23) The Supreme Court has explained that " 'preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth.' " *Croson*, 488 U.S. at 494, 109 S.Ct. at 722 (alteration removed) (quoting *University of California Regents v. Bakke*, 438 U.S. 265, 298, 98 S.Ct. 2733, 2752, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.)). But one remedy the plaintiffs seek— a 15% set aside—would invoke the same, sup-

posedly invidious, classification. Clearly, then, this remedy cannot follow from such an equal protection violation, for the claimed cure is identical to the disease. Moreover, any harm flowing from such classification is lessened (if not erased) by the fact that the MBE program is entirely voluntary: no contractor is required to apply for certification. As Justice Stevens explained in *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 247 n. 5, 115 S.Ct. 2097, 2122 n. 5, 132 L.Ed.2d 158 (1995) (Stevens, J., dissenting opinion), "perhaps [the] ability [of minority contractors] to opt out of the program provides them all the relief they would need."

The 1990 statute contained a sunset provision which stated that "this Act shall be abrogated and of no further force and effect" after June 30, 1995. 1990 Md. Laws, § 4, ch. 708. In 1995, after another study (which had been required by the 1990 version), the MBE statute was reenacted, with amendments. 1995 Md.Laws ch. 116. Like its predecessor, the 1995 version—the one at issue in this case—also has a sunset clause providing for termination on July 1, 2000. § 14–309. Another study is mandated no later than September 30, 1999, "so that the General Assembly may review the report prior to the 2000 Session." 1995 Md.Laws, § 2, ch. 116.

The MBE statute defines a "minority business enterprise" or MBE as

> any legal entity, except a joint venture, that is:
>
> (I) organized to engage in commercial transactions; and
>
> (ii) at least 51% owned and controlled by 1 or more individuals who are members of a group that is disadvantaged socially or economically, including:
>
> 1. African Americans;
>
> 2. American Indians;
>
> 3. Asians;
>
> 4. Hispanics;
>
> 5. women; or
>
> 6. physically or mentally disabled individuals.

§ 14–301(e)(1). Each unit of state government is required to

> structure procurement procedures, consistent with the purposes of this subtitle, to try to achieve the result that a minimum of 14% of the unit's total dollar value of procurement contracts is made directly or indirectly from certified minority business enterprises.

§ 14–302(a)(1). Thus, 14% is commonly referred to as the MBE goal. Section 14–302(a) continues in relevant part:

> (4) To achieve the result specified in paragraph (1) ... of this subsection, a contractor shall:
>
> (I) identify specific work categories appropriate for subcontracting;
>
> (ii) at least 10 days before bid opening, solicit minority business enterprises, through written notice that:
>
> 1. describes the categories of work under item (I) of this subparagraph; and
>
> 2. provides information regarding the type of work being solicited and specific instructions on how to submit a bid;
>
> (iii) attempt to make personal contact with the firms in item (ii) of this paragraph;
>
> (iv) assist minority business enterprises to fulfill bonding requirements or to obtain a waiver of those requirements;
>
> (v) in order to publicize contracting opportunities to minority business enterprises, attend prebid meetings or other meetings scheduled by the unit; and
>
> (vi) upon acceptance of a bid, provide the unit with a list of minority businesses with whom the contractor negotiated, including price quotes from minority and nonminority firms.

The next subsection emphasizes, in obvious attempt at compliance with the *Croson* decision, that the 14% number is a goal and not a strict quota:

> (5)(I) The unit shall make a finding whether the contractor complied, in good faith, with paragraph (4) of this subsection.
>
> (ii) If the unit finds the contractor complied with paragraph (4) of this subsection, the unit may not require the contractor to renegotiate any subcontract in order to achieve a different result.

§ 14–303(a)(5).

The plaintiffs' complaint and opposition brief repeatedly characterizes the Maryland MBE statute as setting a rigid quota

(like the MBE statute in *Croson*) rather than a goal. This allegation is conclusory and is belied by the statute itself; there is nothing in the complaint to raise an inference that it has been administered as a rigid quota. Consequently, this unsupported and vituperative characterization of the statute merits no weight. *See Faulkner,* 945 F.2d at 695 ("self-serving, inaccurate legal conclusions cannot rescue a factually deficient complaint").

### 1. *Overbreadth*

▮ The complaint asserts that the plaintiffs, as African–Americans and Hispanics, are the only legitimate beneficiaries of the MBE statute because, except for these two groups, "there is absolutely no evidence that any of these minority and gender groups have suffered from racial, ethnic and gender discrimination in Maryland." (Compl. ¶ 41(3).) It follows, according to the plaintiffs, that strict scrutiny is the appropriate standard of review and that the statute fails under the standards announced in the *Croson* decision. (Compl. ¶¶ 41(4–7).)

▮ Two lengthy studies upon which the MBE statute is based, however, contain much evidence of discrimination in Maryland contracting against each of the groups protected by the MBE statute. *See* Coopers & Lybrand, *State of Maryland Minority Business Utilization Study, Final Report,* (March 15, 1990) (the "1990 Report"); National Economic Research Associates, Inc., *The Utilization of Minority–Business Enterprises by the State of Maryland, Final Report,* (December 6, 1994) (the "1994 Report"). As *Maryland Highways Contractors* noted, the Maryland General Assembly in 1990 removed protection for Alaskan Natives and Pacific Islanders in response to the 1990 study and *Croson.* "As a result of the [1990] study, the Maryland legislature enacted a new MBE statute protecting those classes of minorities *which the study showed Maryland had discriminated against:* American Indians; Asians; Blacks; Hispanics; women; and physically and mentally disabled individuals." 933 F.2d at 1249 (emphasis added). While it is not appropriate at this stage to evaluate that evidence under *Croson,* the court may take judicial notice of the existence of these studies and the discussion in *Maryland Highways Contractors,* 933 F.2d at 1248–49. It is simply untrue, as the complaint asserts, that no such evidence exists. Additionally, it should be noted that the plaintiffs' assertion in their complaint and opposition brief that strict scrutiny is the appropriate standard of review applies only to racial categories. Classification according to gender is subject to the standard explained in *United States v. Virginia,* 518 U.S. 515, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (expressly disclaiming "equating gender classifications, for all purposes, to classifications based on race or national origin"), phrased by the Court as requiring an "exceedingly persuasive justification." And, while the plaintiffs may or may not seek to contest the inclusion of physically or mentally disabled individuals, classification based on that status is subject only to rational basis review under the constitution, not strict scrutiny. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 445, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985). Thus, ironically, the plaintiffs may have more success in having the preferences for themselves stricken than those for women and disabled individuals, but that is perhaps one of the vicissitudes of attacking this statute ostensibly designed to benefit those attacking it. As M.S.A. § well puts it, the plaintiffs' complaint is, in essence, not that the statute does not benefit them, but rather that they have to share some of the benefits with women and other minorities, i.e., it does not benefit them enough.

▮ Additionally, the plaintiffs allege that the statute is overbroad because it is not limited in geographic area to firms located in Maryland, or those out-of-state firms who have sought to do business within Maryland and, by implication, may have

suffered discrimination in the past by the state of Maryland. According to the complaint, over one-half of the firms certified by the state to participate in the MBE program are located outside of the state. But, like the overbreadth allegation · regarding the groups protected by the statute, this allegation also fails to address the state's findings, which do present a justification rooted in remediation for the state's past discrimination for the statute's geographic scope. *See* 1994 Report, *supra,* at 198; *cf. Croson,* 488 U.S. at 508, 109 S.Ct. at 729 (state presented *no* justification for the statute's geographic scope).

It may or may not be that the Maryland findings are insufficient (again it should be noted that the standard of review will vary depending on the nature of the group protected), but given that the state has made the findings required by *Croson,* the plaintiffs must explain, however briefly, why those findings are inadequate, and not simply ignore them. These findings are a matter of public record, and discovery was not necessary for the plaintiffs to obtain them.

Accordingly, no claim upon which relief may be granted has been stated based upon the statute's overbreadth.

### 2. *Administration of the Statute As A Pretext For Discrimination*

▮ Putting aside the issue of the statute's facial unconstitutionality, the plaintiffs allege that it has been administered as a pretext for discrimination. They allege that the state has allowed white males to accomplish "sham and bogus stock transfer transactions to their wives, daughters, sisters and others" to gain coverage under the MBE statute. (Compl.¶ 41(7).) It may be that with some factual support this allegation would state a claim. But as baldly alleged, it falls far short of doing so, and is not saved by the further allegation that the "state's most recent report shows

that MBE firms owned by white women received over ... 70% of the state's MBE subcontract awards although such firms constitute only ... 30% of the total number of state MBE firms." (*Id.*) Without some correlation to the breakdown of firms actually bidding on these projects, no inference of discrimination may follow.[8] It is not suggested, however, that disparate impact alone would raise an inference of intentional discrimination. Again, a finding that a government's "decision carried a discriminatory 'ultimate effect' is without independent constitutional significance.' " *Village of Arlington Heights,* 429 U.S. at 271, 97 S.Ct. at 566. This claim will accordingly be dismissed.

### *CONCLUSION*

As to counts 1 and 4, the three individual plaintiffs but not MMCA have standing to seek damages, and because the individual plaintiffs also have standing to seek injunctive relief, it is not necessary to decide whether MMCA would have standing to do so. Counts 1 and 4 nevertheless will be dismissed for failure to allege the intentional discrimination required to state an equal protection claim. Counts 2, 5 and 6 will be dismissed because no plaintiff has standing. As to count 3, the three individual plaintiffs (but not MMCA) have standing, but they fail to state a claim to invalidate the Maryland MBE statute.

---

**8.** Additionally, plaintiffs have not alleged that they lost the opportunity to compete on an even footing with any of these "sham" wom-en-owned firms, and thus also fail to establish standing to assert this allegation.