In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3652

KYRA KYLES and LOLITA PIERCE,

Plaintiffs-Appellants,

v.

J.K. GUARDIAN SECURITY SERVICES, INC.,
d/b/a GUARDIAN SECURITY SERVICES,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8311--Suzanne B. Conlon, Judge.

Argued February 23, 1999--Decided July 5, 2000

Before COFFEY, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Kyra Kyles and Lolita
Pierce worked for the Legal Assistance Foundation
of Chicago ("LAF") as employment testers./1 In
that capacity, they applied for work as a
receptionist with Guardian Security Services
("Guardian"). Although each of their white
counterparts was offered the job, neither Kyles
nor Pierce, both of whom are African-American,
got past the initial interview. They sued
Guardian for race discrimination under Title VII
of the Civil Rights Act of 1964, 42 U.S.C. sec.
2000e, as well as section 1 of the Civil Rights
Act of 1866, 42 U.S.C. sec. 1981. The district
court granted summary judgment in favor of
Guardian, reasoning that, as testers with no
genuine interest in employment with Guardian,
Kyles and Pierce lacked standing to sue. We
conclude that testers do have standing to sue for
violations of Title VII, but not section 1981.

I.

Because the district court entered summary
judgment in favor of Guardian, we owe Kyles and
Pierce a favorable summary of the facts. See
Frobose v. American Sav. & Loan Ass'n of
Danville, 152 F.3d 602, 604 (7th Cir. 1998).

LAF is a public-interest law firm that provides

legal assistance to individuals who lack the means to retain counsel privately. Its employment testing project aims to detect discrimination in the employment sector using testing methods that have been used for years to assess compliance with the nation's fair housing laws. Specifically, in order to detect racial discrimination, LAF pairs a white tester with one of color, provides them both with fictitious credentials designed to be comparable in all pertinent respects (and perhaps somewhat more favorable to the non-white tester/2), trains them to interview similarly, and then sends them to apply for work with the same employer. The testers later prepare detailed reports of their experiences. The project director reviews the data, and when it appears that an employer is engaged in discrimination, informs the testers. Alone or in conjunction with bona fide job applicants, the testers who were rejected for employment may then pursue administrative and judicial remedies, as they did in this case. In order to remove questions about their objectivity and neutrality, however, the testers assigned their right to damages to LAF, and later to the Chicago Lawyers' Committee for Civil Rights Under Law and the Public Interest Law Initiative.

Kyles and Pierce were college students in 1995 when they took summer jobs with the LAF's employment testing project. As a condition of their employment with the project, they agreed to refuse any job offer extended to them in the course of their testing activities. With the help of LAF staff members, Kyles and Pierce then prepared fictitious resumes that supplemented their actual experiences with additional employment, education, and other data aimed at making them attractive to prospective employers.

In the Spring of 1995, Guardian placed an advertisement in the Chicago Tribune soliciting applications for the position of receptionist. LAF sent a pair of resumes to Guardian in response to the advertisement--one on behalf of a white candidate and one on behalf of an African-American candidate. Each of the resumes included information that permitted the reader to discern the race of the applicant. The African-American's resume reflected credentials that were comparable to, if not better than, the white applicant. Guardian did not respond to the African-American's application at all, but telephoned three times for the white candidate.

LAF subsequently sent Kyles and Pierce to Guardian to apply in person for the receptionist opening. Each was paired with a white tester. Although Kyles and Pierce were assigned credentials that were comparable or superior to

those of their white counterparts, neither one of them fared as well in the application process.

Kyles had an interview with Guardian's director of human resources, Martin Labno, who told her that after consulting with Guardian's president and vice-president, he would ultimately select a group of three to four individuals to call back for a second interview. When Kyles' white counterpart applied for the job the following day, she interviewed not only with Labno but with Guardian's vice-president, Michael Malinowski, returned a day later for a typing test, and was offered the job on the spot. Soon after the white tester turned the offer down, Kyles called Guardian to check on the status of her application and was told that Labno had not yet decided whom to summon for a second interview. She never heard from Guardian again.

Within a few days, Pierce applied for the job. Labno interviewed her and told her that, after consulting with the company's president or its vice-president, he would be conducting follow-up interviews over the next few days. He promised to call her within a day or two. Pierce's white partner applied for the job on the same day, interviewed with Labno, and took a typing test. One week later, Guardian summoned the white tester for a second interview and offered her the job. When Pierce telephoned around that time to inquire about the status of the selection process, Labno told her that the company was "running behind." The white tester turned down the job offer, but Guardian never followed up with Pierce.

After securing right-to-sue letters from the Equal Employment Opportunity Commission ("EEOC"),/3 Kyles and Pierce filed suit against Guardian alleging that the company had engaged in racial discrimination in violation of both Title VII and section 1981. Guardian counterclaimed, alleging that Kyles and Pierce had fraudulently misrepresented their interest in employment with the company. On summary judgment, Judge Conlon held that, as testers, Kyles and Pierce lacked standing to maintain the suit. Kyles v. J.K. Guardian Security Servs., Inc., 77 Fair Empl. Prac. Cas. (BNA) 1473, 1998 WL 677165 (N.D. Ill. Sept. 22, 1998). They were not interested in working for Guardian and would not have accepted employment had the company offered it to them. Consequently, they did not suffer the type of personal, redressable injury that would satisfy the "case or controversy" requirement found in Article III of the Constitution. Id., at *2. At best, the plaintiffs were asserting the rights of a "hypothetical third-party applicant who would have been harmed in a similar situation." Id., at

*3. Judge Conlon also found standing wanting as a statutory matter. Id., at *3-*4. Both Title VII and section 1981 condition the right to sue on a bona fide application for employment, she reasoned. Id., at *3. In that regard, they stand apart from the Fair Housing Act, under which courts have acknowledged tester standing. Id. Having found that the plaintiffs lacked standing to pursue their federal claims, Judge Conlon relinquished jurisdiction over Guardian's state-law counterclaims. Id., at *4; see 28 U.S.C. sec. 1367(c)(3).

II.

The Constitution confines the federal judicial power to "Cases" or "Controversies." U.S. Const. Art. III, sec. 2. Implicit in that limitation is the requirement that the party invoking the court's jurisdiction have standing. Arizonans for Official English v. Arizona, 520 U.S. 43, 64, 117 S. Ct. 1055, 1067 (1997); Gillespie v. City of Indianapolis, 185 F.3d 693, 701 (7th Cir. 1999), cert. denied, 120 S. Ct. 934 (2000). Broadly speaking, standing turns on one's personal stake in the dispute. See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72, 98 S. Ct. 2620, 2630 (1978). In order to establish that interest, the plaintiff must show that: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 2136 (1992); Gillespie, 185 F.3d at 701.

A plaintiff's claim might satisfy each of these Article III criteria and yet run afoul of judicially-imposed, prudential limitations on standing. The injury that she claims, for example, may be one that is indistinct from effects felt by many or all citizens, depriving her of a unique stake in the controversy. See Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205 (1975). Her claim may rest on the legal rights of third parties, rather than her own. Id. at 499, 95 S. Ct. at 2205; see Singleton v. Wulff, 428 U.S. 106, 114, 96 S. Ct. 2868, 2874 (1976). Or her interest, although real, may not fall within the zone of interests protected by the statute she invokes. See Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 39 n.19, 96 S. Ct. 1917, 1925 n.19 (1976), citing Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S. Ct. 827, 830 (1970). Using these prudential considerations,

"the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100, 99 S. Ct. 1601, 1608 (1979); see also Massey v. Helman, 196 F.3d 727, 739 (7th Cir. 1999), petition for cert. filed (May 30, 2000) (No. 99-1918).

Where federal statutory rights are at issue, however, Congress has considerable authority to shape the assessment of standing. First, although it may not lower the threshold for standing below the minimum requirements imposed by the Constitution, Raines v. Byrd, 521 U.S. 811, 820 n.3, 117 S.Ct. 2312, 2318 n.3 (1997), Congress can extend standing to the outermost limits of Article III. For example, it may permit an individual who suffers an injury-in-fact to bring suit for a statutory violation even if one normally would not think of that person as an intended beneficiary of the statute; or it can permit someone to seek relief based on the legal rights of individuals other than himself. See Warth, 422 U.S. at 500-01, 95 S. Ct. at 2206; North Shore Gas Co. v. E.P.A., 930 F.2d 1239, 1243-44 (7th Cir. 1991). When Congress confers such a broad right to sue, the judiciary may not close the doors to the courthouse by invoking prudential considerations. See Raines, 521 U.S. at 820 n.3, 117 S.Ct. at 2318 n.3; Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S. Ct. 1114, 1121 (1982). Second, Congress has the power to "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." Linda R. S. v. Richard D., 410 U.S. 614, 617 n.3, 93 S. Ct. 1146, 1148 n.3 (1973).

As we shall see, then, whether a person has Article III standing to sue under either Title VII or section 1981 depends in great measure on the particular rights conferred by those statutes. See Warth, 422 U.S. at 500-01, 95 S. Ct. at 2206. Family & Children's Center, Inc. v. School City of Mishawaka, 13 F.3d 1052, 1059-60 (7th Cir.), cert. denied, 513 U.S. 961, 115 S. Ct. 420 (1994). We will proceed to examine each statute in turn.

III.
A.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire . . . any individual . . . because of such individual's race . . . ; or (2) to limit, segregate, or classify his

employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race. . . ." 42 U.S.C. sec. 2000e-2(a). Congress granted the EEOC authority to enforce the provisions of the statute, but it did not stop there; it also enabled individuals to act as "private attorneys general" by pursuing their own claims of employment discrimination. Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402, 88 S. Ct. 964, 966 (1968) (per curiam). The statute thus expressly permits a charge to be filed with the Commission "by or on behalf of a person claiming to be aggrieved," sec. 2000e-5(b), and likewise a civil action in court "by the person claiming to be aggrieved," sec. 2000e-5(f)(1). That language signals a congressional intent to extend standing to the outermost limits of Article III. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 93 S. Ct. 364, 366-67 (1972), citing Hackett v. McGuire Bros., Inc., 445 F.2d 442, 446 (3d Cir. 1971); Anjelino v. New York Times Co., 200 F.3d 73, 91 & n.25 (3d Cir. 1999); Stewart v. Hannon, 675 F.2d 846, 849 (7th Cir. 1982); E.E.O.C. v. Mississippi College, 626 F.2d 477, 482-83 & n.7 (5th Cir. 1980), cert. denied, 453 U.S. 912, 101 S. Ct. 3143 (1981); E.E.O.C. v. Bailey Co., 563 F.2d 439, 452-54 (6th Cir. 1977), cert. denied, 435 U.S. 915, 98 S. Ct. 1468 (1978); Waters v. Heublein, Inc., 547 F.2d 466, 469-70 (9th Cir. 1976), cert. denied, 433 U.S. 915, 97 S. Ct. 2988 (1977); Gray v. Greyhound Lines, East, 545 F.2d 169, 176 (D.C. Cir. 1976). The essential question before us, then, is whether a tester "claiming to be aggrieved" by an employment practice that Title VII proscribes has suffered the injury-in-fact that Article III demands.

For guidance in answering this question, we turn first to case law concerning Title VIII of the Civil Rights Act of 1968, 42 U.S.C. sec. 3601, et seq., which prohibits discrimination in the housing sector and is more commonly known as the Fair Housing Act. Courts have recognized that Title VIII is the functional equivalent of Title VII, Bailey Co., 563 F.2d at 452-53; Waters, 547 F.2d at 469, and so the provisions of these two statutes are given like construction and application. See Stewart, 675 F.2d at 849; Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1289 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 98 S. Ct. 752 (1978); see also Anjelino, 200 F.3d at 90-91 & nn. 23, 25; Betsey v. Turtle Creek Assocs., 736 F.2d 983, 987 (4th Cir. 1984); Mississippi College, 626 F.2d at 482-83 & n.7; Bailey Co., 563 F.2d at 452-53; Waters, 547 F.2d at 469-70.

Like its companion, Title VIII permits a charge and a civil action to be filed by any person "aggrieved" by a violation of the statute. 42 U.S.C. sec.sec. 3610(a)(1)(A)(i), 3602(i); see Trafficante, 409 U.S. at 209, 95 S. Ct. at 366-67 (1972). Courts have construed those provisions to confer standing on testers challenging a variety of unlawful housing practices.

In Havens Realty Corp. v. Coleman, the Supreme Court held that testers have standing to bring suit for alleged violations of section 804(d) of the Fair Housing Act, which makes it an unlawful practice "[t]o represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 42 U.S.C. sec. 3604(d). The complaint in Havens Realty alleged that the defendant realty firm engaged in racial steering by misinforming African-Americans that no apartments were available in one of its complexes. The plaintiffs included an African-American man who had unsuccessfully sought housing from the defendant, as well as a local organization that promoted equal housing opportunities and two testers that the organization had engaged specifically to determine whether the defendant was engaging in unlawful steering. The district court had dismissed the testers from the case, but the Supreme Court concluded that one of them had standing to sue.

Citing its earlier decision in Gladstone, Realtors v. Village of Bellwood, supra, 441 U.S. 91, 99 S. Ct. 1601, the Court at the outset emphasized:

"Congress intended standing under [the Fair Housing Act] to extend to the full limits of Art. III" and . . . the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section. Id. at 103, n.9, 109, 99 S. Ct. at 1609, n.9, 1612. Thus the sole requirement for standing to sue under [the Fair Housing Act] is the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered "a distinct and palpable injury," Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

455 U.S. at 372, 102 S. Ct. at 1121. When Congress enacted the Fair Housing Act, the Court went on to explain, it conferred upon "any person" a right to truthful information about the availability of housing; and it made that and the other provisions of the Act enforceable by means of a private civil suit. Id. at 373, 102 S. Ct.

at 1121, citing 42 U.S.C. sec. 3604(d).

  In this way, Congress had created a legal right, the denial of which would, in and of itself, give rise to the type of injury necessary to establish standing in conformance with Article III. Ibid. Thus, any person given false information about the availability of housing has standing to sue, irrespective of her intent in inquiring about the housing in question.

A tester who has been the object of a misrepresentation made unlawful under sec. 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions. That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of sec. 804(d). See Pierson v. Ray, 386 U.S. 547, 558, 87 S. Ct. 1213, 1219, 18 L. Ed. 2d 288 (1967); Evers v. Dwyer, 358 U.S. 202, 204, 79 S. Ct. 178, 179, 3 L. Ed. 2d 222 (1985) (per curiam).

455 U.S. at 373-74, 102 S.Ct. at 1121-22./4 The Court thus concluded that one--but not both--of the testers had standing to sue under the statute. The African-American tester alleged that she had been wrongly informed on four separate occasions that an apartment was unavailable at the defendant's properties; whereas her Caucasian counterpart had been told that apartments were available. The former thus suffered an injury cognizable under the statute, while the latter did not. Id. at 374-75; 102 S. Ct. at 1122.

  Following Havens, this court concluded in Village of Bellwood v. Dwivedi, 895 F.2d 1521 (7th Cir. 1990), that testers have standing to sue under other provisions of the Fair Housing Act. Although section 804(d) forbids false statements that housing is unavailable, as we noted above, section 804(a) makes it illegal, inter alia, for one to make housing unavailable to a person because of his race (see n.6, infra), and section 804(b) proscribes racial discrimination in the provision of services in connection with the sale of a dwelling. The plaintiffs in Dwivedi, who again included testers, alleged that a real estate brokerage firm, its owner, and two of its employees had engaged in racial steering by encouraging African-American home seekers toward areas with a substantial African-American population while encouraging Caucasian buyers toward areas that did not. Although we thought the standing of the testers, "as an original matter," to be "dubious," 895 F.2d at 1526, we

acknowledged Havens' holding that testers have standing to sue for violations of section 804(d). No misrepresentations as the availability of housing actionable under that section were proven in Dwivedi. But the essential point of Havens was that "Congress can create new substantive rights, such as a right to be free from misrepresentations, and if that right is invaded the holder of the right can sue without running afoul of Article III, even if he incurs no other injury (for example, the loss of a home-buying opportunity)." Id. at 1526-27. We were therefore convinced that testers had standing to sue, not just for receipt of false information in violation of section 804(d), but for other violations of the statute as well:

[T]he logic of Havens embraces discrimination in the provision of services, forbidden explicitly by section [804(b)] and implicitly by section [804(a)]. If the plaintiffs' evidence is believed, the testers were treated in a racially discriminatory fashion, even though they sustained no harm beyond the discrimination itself, just as testers are not fooled by the misrepresentations made to them.

Id. at 1527.

Since Dwivedi was decided, we have twice confirmed its holding expressly. See United States v. Balistrieri, 981 F.2d 916, 929 (7th Cir. 1992) ("offering black testers apartments at higher rental rates than those offered to white testers discriminates in the terms of rentals and violates the Act"), cert. denied, 510 U.S. 812, 114 S. Ct. 58 (1993); City of Chicago v. Matchmaker Real Estate Sales Center, Inc., 982 F.2d 1086, 1095 (7th Cir. 1992) ("the testers were treated in a 'racially discriminatory fashion, even though they sustained no harm beyond the discrimination itself'") (quoting Dwivedi, 895 F.2d at 1527), cert. denied, 508 U.S. 972, 113 S. Ct. 2961 (1993). Notwithstanding our initial skepticism on the subject, then, it is now well established in this circuit that testers who experience housing discrimination suffer a cognizable injury that gives them standing to sue for a variety of Fair Housing Act violations. See id. at 1095 (finding that testers have standing to sue for violations of sections 804(a), (b), and (d) of the Fair Housing Act); Balistrieri, 981 F.2d at 929 (showing black testers fewer apartments, and quoting them higher rents and/or later dates of availability, constituted cognizable violations of sections 804(b) and (d) of the Fair Housing Act, notwithstanding the fact that testers were not bona fide apartment seekers); see also Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010 (7th Cir.

1998) ("'Testers' in housing discrimination cases are allowed to recover exemplary damages even though they do not want to occupy the apartments for which they apply . . . .").

Title VII contains no provision comparable to section 804(d) of the Fair Housing Act. The district court seized upon that point of distinction as a basis for holding that testers lack standing to complain of employment discrimination under Title VII. 1998 WL 677165, at *3. In the other key respects we have mentioned, however, the statutes are quite similar: Both take broad aim at discrimination in their respective sectors and in that sense are the functional equivalents of one another; E.E.O.C. v. Bailey Co., supra, 563 F.2d at 453, 454; both authorize individuals to bring suit for statutory violations and in this way to act as "private attorneys general," Trafficante v. Metropolitan Life Ins. Co., 409 U.S. at 209, 93 S. Ct. at 366-67; Bailey Co., 563 F.2d at 453; and in permitting any person aggrieved by a violation to file a charge and suit, both reflect a congressional intent to extend standing to the fullest extent permitted by Article III of the Constitution, see Trafficante, 409 U.S. at 209, 93 S. Ct. at 366-67; Anjelino v. New York Times Co., supra, 200 F.3d at 90-91 & n.25; Stewart v. Hannon, supra, 675 F.2d at 849; E.E.O.C. v. Mississippi College, supra, 626 F.2d at 482-83 & n.7; Bailey Co., 563 F.2d at 453; Waters v. Heublein, Inc., supra, 547 F.2d at 469-70; Gray v. Greyhound Lines, East, supra, 545 F.2d at 176; Hackett v. McGuire Bros., Inc., supra, 445 F.2d at 446.

Havens and Dwivedi guide us to the conclusion that testers who experience discrimination as they apply for jobs have standing to sue under Title VII. When Congress made it unlawful for an employer "to limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee . . . because of such individual's race. . . .," 42 U.S.C. sec. 2000e-2(a)(2), it created a broad substantive right that extends far beyond the simple refusal or failure to hire. Cf. sec. 2000e-2(a)(1). When a job applicant is not considered for a job simply because she is African-American, she has been limited, segregated or classified in a way that would tend to deprive not only her, but any other individual who happens to be a person of color, of employment opportunities. In other words, she suffers an injury "in precisely the form the statute was intended to guard against," just as she would if, as a housing tester, she were falsely informed that a vacant apartment was

unavailable. Havens, 455 U.S. at 373, 102 S. Ct. at 1121. She therefore has standing to sue, even if she has not been harmed apart from the statutory violation--even if, for example, she was not genuinely interested in the job she applied for and in that sense was not harmed by the employer's refusal to hire her. See Dwivedi, 895 F.2d at 1526-27; see also Molovinsky v. Fair Employment Council of Greater Washington, Inc., 683 A.2d 142, 146 (D.C.1996) (per curiam) (testers have standing to sue for sexual harassment under local ordinance, akin to Title VII, prohibiting sex discrimination in employment). But see Sledge v. J.P. Stevens & Co., 585 F.2d 625, 641 (4th Cir. 1978) ("'tester' plaintiffs are not, of course, harmed by a refusal to hire since they are not seriously interested in the job for which they apply"), cert. denied, 440 U.S. 981, 99 S. Ct. 1789 (1979); Parr v. Woodmen of the World Life Ins. Soc'y, 657 F. Supp. 1022, 1032-33 (M.D. Ga. 1987) (plaintiff who had no genuine interest in employment with defendant could not make prima facie case of employment discrimination); Allen v. Prince George's County, Maryland, 538 F. Supp. 833, 841-43 (D. Md. 1982) (same), judgment aff'd on other grounds, 737 F.2d 1299 (4th Cir. 1984).

Recognizing tester standing is consistent with the statute's purpose. Title VII reflects the strong public interest in eradicating discrimination from the workplace. E.g., Franks v. Bowman Transp. Co., 424 U.S. 747, 763, 96 S. Ct. 1251, 1263 (1976). Individuals serve that end, as well as their own interest in compensation for the wrongs done to them, when they file suit to challenge discriminatory employment practices--that is why the Supreme Court has described them as "private attorneys general." Newman v. Piggie Park Enters., Inc., supra, 390 U.S. at 402, 88 S. Ct. at 966; see also McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 358, 115 S. Ct. 879, 884 (1995); E.E.O.C. v. Associated Dry Goods Corp., 449 U.S. 590, 602, 101 S. Ct. 817, 824 (1981); Alexander v. Gardner-Denver Co., 415 U.S. 36, 45, 94 S. Ct. 1011, 1018 (1974). Testers advance that same public interest. Indeed, because proof of discrimination is often quite difficult to muster--especially so in the hiring process-- testers provide evidence that, we have recognized, "is frequently valuable, if not indispensable." Richardson v. Howard, 712 F.2d 319, 321 (7th Cir. 1983). The fact that testers have no interest in a job does not diminish the deterrent role they play by filing suit under Title VII. In that regard, testers are situated similarly to unlawfully discharged employees who are ineligible for reinstatement because of wrongdoing discovered after they were fired.

Evidence of such wrongdoing limits the relief they may obtain under Title VII, but it does not bar them from bringing suit. McKennon, 513 U.S. at 358-59, 115 S. Ct. at 884-85.

For these very reasons, the EEOC has likewise concluded that employment testers have standing to pursue relief under the statute. In 1990, and again in 1996, the Commission issued policy guidance statements to that effect. See EEOC, Policy Guidance No. 915-062 ("Policy Guide on Use of 'Testers' in Employment Selection Process") (Nov. 20, 1990), superseded by EEOC, Enforcement Guidance No. N-915.002 ("Enforcement Guidance: Whether 'Testers' Can File Charges and Litigate Claims of Employment Discrimination") (May 22, 1996) <http:// www.eeoc.gov/docs/testers.txt>, reprinted in Fair Employment Practices Manual (BNA) 405:6899 (2000). The EEOC's analysis, of course, does not bind us. But as the agency charged with enforcing Title VII, the Commission has experience and familiarity in this field which bestow upon its judgment an added persuasive force. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404 (1986); Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 n.7 (7th Cir. 1998) (collecting cases). The Commission's view that testers have standing to pursue Title VII claims both informs and supports our holding today.

Before concluding our discussion of Title VII, we must address one other aspect of the decision below. As we noted earlier, Judge Conlon found that the plaintiffs failed to meet the standing requirements imposed not only by Article III, but by Title VII itself. 1998 WL 677165, at *3-*4. Unless the plaintiff can establish that she was a bona fide applicant for employment, the judge reasoned, she lacks standing to make a claim under either Title VII or section 1981. Id. at *3. We make two brief points in that regard.
First, although the district judge addressed the bona fide application as a statutory prerequisite for standing, it really goes to the merits of the plaintiffs' claim. Indeed, the two cases Judge Conlon cited in support of this requirement-- Allen v. Prince George's County, Maryland, 538 F. Supp. at 841-43, and Parr v. Woodmen of the World Life Ins. Soc'y, 657 F. Supp. at 1032-33, discussed the bona fide application as an element of the plaintiff's prima facie case, not standing. We addressed the distinction in Fry v. UAL Corp., 84 F.3d 936, 939 (7th Cir.), cert. denied, 519 U.S. 987, 117 S. Ct. 447 (1996), explaining that when a statute clearly does not confer rights upon a particular class of individuals, "a suit under the statute by a member of that class does not engage the jurisdiction of the federal courts," citing

Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 814, 106 S. Ct. 3229, 3235 (1986). But where the reach of the statute is not so clear, we explained, "the question whether a particular class is protected by it becomes just another issue concerning the merits of the suit . . . ." 84 F.3d at 939. In this case, Kyles and Pierce have asserted the injury-in-fact that Article III requires. Whether they can establish a prima facie case of employment discrimination is a question that implicates the merits of their claim rather than their standing to make it. See Whitlock v. Johnson, 153 F.3d 380, 385 (7th Cir. 1998).

Second, we find no support in Title VII for a requirement that a job applicant must have a bona fide interest in working for a particular employer if she is to make out a prima facie case of employment discrimination. In contrast to section 804(a) of the Fair Housing Act, which makes it unlawful, inter alia, "[t]o refuse to sell or rent after the making of a bona fide offer," 42 U.S.C. sec. 3604(a),/5 Title VII does not limit its protection to bona fide job seekers. Rather, as we noted at the outset of our analysis, the statute proscribes employment practices which "in any way . . . would deprive or tend to deprive any individual of employment opportunities," sec. 2000e-2(a)(2) (emphasis ours), and authorizes a charge "by or on behalf of a person claiming to be aggrieved," sec. 2000e-5(b). Kyles and Pierce both claim to be aggrieved by the discriminatory practices they attribute to Guardian. The fact that they had no interest in actually working for the company certainly speaks to the nature and extent of their injuries as well as the appropriate relief. See McKennon, 513 U.S. at 360-62, 115 S. Ct. at 885-86. But it does not rule out the prospect that they were injured. We have long recognized that humiliation, embarrassment, and like injuries--the very type of injuries that Kyles and Pierce allege they suffered (see R. 1 at 11 para. 42)--constitute cognizable and compensable harms stemming from discrimination. See, e.g., Seaton v. Sky Realty Co., 491 F.2d 634, 636-38 (7th Cir. 1974); Tyus v. Urban Search Management, 102 F.3d 256, 265 (7th Cir. 1996), cert. denied, 520 U.S. 1251, 117 S. Ct. 2409 (1997).

As individuals who applied for work with Guardian Security and allege that they were treated in a discriminatory fashion, Kyles and Pierce have standing to sue the firm under Title VII. The statute confers upon all individuals a right to be free from racial discriminatory practices in employment. If the plaintiffs' allegations are true, then Guardian violated that right and the plaintiffs suffered an actual injury that gave them the right to sue, whether

or not Kyles or Pierce were truly interested in employment.

B.

Section 1 of the Civil Rights Act of 1866 forbids discrimination on the basis of race in the making and enforcement of private as well as public contracts. Runyon v. McCrary, 427 U.S. 160, 168, 96 S. Ct. 2586, 2593 (1976). In relevant part, the statute provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .

42 U.S.C. sec. 1981. Insofar as the statute reaches private conduct, it reflects the exercise of congressional authority under the Thirteenth Amendment to relieve African-Americans of the "badges and incidents" of slavery. Runyon, 427 U.S. at 179, 96 S. Ct. at 2598-99; see also Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439, 88 S. Ct. 2186, 2203 (1968).

Relatively few courts have considered whether testers have standing to challenge discriminatory employment practices pursuant to section 1981. The Supreme Court has yet to address the question. Two circuits, the Third and the Eleventh, have held that testers have standing to challenge discriminatory housing practices under another provision dating back to the Reconstruction era, 42 U.S.C. sec.1982. Watts v. Boyd Properties, Inc., 758 F.2d 1482, 1485 (11th Cir. 1985); Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 898 (3d Cir. 1977), overruled on other grounds by Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985), aff'd, 482 U.S. 656, 107 S. Ct. 2617 (1987)./6 That statute provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. sec. 1982. Given the similarity in purpose and phrasing between the two provisions, we may assume that these circuits would have reached the same conclusion with respect to section 1981./7 See also Coel v. Rose Tree Manor Apartments, Inc., No. 84 C 1521, 1987 WL 18393, at *6 (E.D. Pa. Oct. 13, 1987) (finding that testers have standing to challenge housing discrimination under section 1981); Pumphrey v. Stephen Homes, Inc., No. 93 C 1329, 1994 WL 150947, at *4 (D. Md. Feb. 24, 1994) (tester has

standing under sec.sec. 1981 and 1982 to sue for housing discrimination), judgment aff'd in part, rev'd in part & remanded on other grounds without published op., 110 F.3d 60, text in Westlaw, 1997 WL 135688 (4th Cir. Mar. 25, 1997); Open Housing Center, Inc. v. Samson Mgmnt. Corp., 152 F.R.D. 472 (S.D.N.Y. 1993) (holding that testers could serve as class representatives in suit alleging violations of sec.sec. 1981 and 1982, as well as Fair Housing Act); City of Evanston v. Baird & Warner, Inc., No. 89 C 1098, 1990 WL 186575, at *5 (N.D. Ill. Nov. 15, 1990) (Nordberg, J.) (finding that tester has standing under section 1982); Leadership Council for Metropolitan Open Communities v. Chicago Southwest Holiday Inn Operators Oak Lawn Lodge, Inc., No. 84 C 7564, 1986 WL 10360, at *1 (N.D. Ill. Sept. 8, 1986), and 1986 WL 5651, at *4 (N.D. Ill. May 6, 1986) (Williams, J.) (finding that tester has standing to sue under civil rights laws, including sec. 1981); Biggus v. Southmark Mgmnt. Corp., No. 83 C 4024, 1985 WL 1751, at *5-6 (N.D. Ill. June 13, 1985) (Marshall, J.) (finding tester standing under sec.sec. 1981 and 1982).

More recently, however, the D.C. Circuit has confronted the question head-on and concluded that testers lack standing to sue under section 1981 for employment discrimination. Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1270-72 (D.C. Cir. 1994). As in this case, the two plaintiff testers in BMC were African-American college students employed by the Fair Employment Council of Greater Washington. In conjunction with white testers, they sought job referrals from the defendant BMC, which operated an employment agency. The white testers both received referrals, while the black testers did not; indeed, the agency refused even to accept an application from one of the African Americans. The African-American testers contended that BMC had violated their rights under section 1981 by depriving them of the opportunity to enter into contracts with the employment agency itself, as well as the employers to which the agency would have referred them.

The court concluded that the testers suffered no cognizable loss of contractual rights vis a vis either the employment agency or prospective employers. When they approached BMC, the court pointed out, the testers had misrepresented their interest in employment and presented fictitious credentials. Id. at 1270-71. In view of those misrepresentations, any contract that the testers might have entered into with the agency could have been voided at the agency's option. Id. at 1271. Being deprived of the chance to enter a voidable contract was not, in the court's view, an injury cognizable under section 1981. Id. As

for prospective employers:

[T]he testers concededly had no interest in securing a job through BMC. Indeed, they had promised the Council to refuse any offer of employment that they received in conjunction with their testing activities. . . . In depositions, both of the tester plaintiffs confirmed that they would have rejected any job offer obtained through a referral from BMC. . . . At most, then, BMC deprived the tester plaintiffs of the opportunity to refuse to enter into an employment contract with BMC's clients. This too is not an injury cognizable under sec. 1981.

Id.

Kyles and Pierce, of course, are in the same position as the testers in BMC. They had no genuine interest in employment with Guardian, and neither would have accepted an offer of employment had one been extended. Indeed, both had signed agreements with LAF promising not to accept employment with any of the firms whose employment practices they were directed to test. The women do allege that they suffered humiliation and other emotional distress as a result of Guardian's asserted discrimination. R. 1 at 9 para. 36. But in terms of the essential right that section 1981 protects--the right to make and enforce a contract--Kyles and Pierce suffered no injury. Their goal in approaching Guardian was not to enter into a contract with the company. At most, as the court recognized in BMC, Kyles and Pierce were seeking the opportunity to decline an offer of employment. 28 F.3d at 1271. Given the terms of the statute, that interest is not sufficient to confer standing to sue for asserted violations of section 1981./8

Although, insofar as employment contracts are concerned, section 1981 and Title VII share the same purpose, the two statutes are different in important respects. Title VII takes aim at a wide range of racially discriminatory practices which, among other things, either "deprive or tend to deprive any individual of employment opportunities . . . ." 42 U.S.C. sec. 2000e-2(a)(2) (emphasis supplied). It also bestows on any person "aggrieved" by a violation of the statute the right to initiate a charge, sec. 2000e-5(b), signaling that Congress meant to extend standing to the outer boundaries laid down by Article III of the Constitution. See Trafficante, 407 U.S. at 209, 93 S. Ct. at 366-67, and the other authorities collected above at pages 8-9 and 13. Title VII thus creates a substantive and enforceable right to be free from any attempt "to limit, segregate, or classify"

applicants for employment on the basis of race in a way that might tend to deprive the applicant, or any individual, of employment opportunities. sec. 2000e-2(a)(2). Section 1981, by contrast, does not proscribe any practice that might tend to interfere with one's ability to enter and enforce a contract; it protects the right to enter into and preserve a contractual relationship, period. Moreover, there is nothing in section 1981's language suggesting that Congress meant to stretch standing to the limits of Article III. See BMC, 28 F.3d at 1278-79; Maryland Minority Contractor's Ass'n, Inc. v. Maryland Stadium Auth., 70 F. Supp. 2d 580, 588 (D. Md. 1998), aff'd without published op., 198 F.3d 237, text in Westlaw, 1999 WL 827553 (4th Cir. Oct. 18, 1999); City of Evanston v. Baird & Warner, Inc., supra, No. 89 C 1098, 1990 WL 186575, at *4; Saunders v. General Servs. Corp., 659 F. Supp. 1042, 1054 (E.D. Va. 1987).

Havens and Dwivedi reveal these to be key distinctions. As both cases recognize, Congress has the authority to create a substantive right, the denial of which alone gives rise to a cognizable injury and the right to sue, even if the plaintiff does not suffer the type of core injury that the statute protects. In Havens, the right was one not to be falsely informed that housing was unavailable. A tester given such information would suffer an injury notwithstanding the fact that she was not actually in need or desire of housing. In Dwivedi, the right that Congress created was the broad right not to be subjected to discriminatory services related to the sale of a home. Any person subjected to such discrimination would thus incur a cognizable injury even if she had no genuine interest in purchasing a home.

The terms of 1981 are more narrow, however--it protects the contractual relationship itself. The class of persons who may bring suit is therefore limited to persons who actually wish to enter into (or remain in) that relationship. Because they were not genuinely interested in employment with Guardian, and indeed were obliged to turn down any offer of employment that Guardian might have extended to them, Kyles and Pierce do not fall within this class.

To be sure, there are two Supreme Court precedents that lend partial support to the plaintiffs' case for standing. In Evers v. Dwyer, 358 U.S. 202, 79 S. Ct. 178 (1958), Evers, an African-American resident of Memphis, asked a federal court to declare invalid a Tennessee statute requiring segregated seating on public conveyances. Evers himself had been evicted from a Memphis bus under threat of arrest after he

refused to take a seat in the rear. The district court dismissed his complaint, reasoning that there was no "actual controversy" as required by the Declaratory Judgment Act, 28 U.S.C. sec. 2201, because the evidence revealed that Evers had boarded the bus solely for the purpose of initiating litigation. However, the Supreme Court found Evers' motive for boarding the bus to be immaterial.

> We do not believe that appellant, in order to demonstrate the existence of an "actual controversy" over the validity of the statute here challenged, was bound to continue to ride the Memphis buses at the risk of arrest if he refused to seat himself in the space in such vehicles assigned to colored passengers. A resident of a municipality who cannot use transportation facilities therein without being subjected by statute to special disabilities necessarily has, we think, a substantial, immediate, and real interest in the validity of the statute which imposes the disability. That the appellant may have boarded this particular bus for the purpose of instituting this litigation is not significant.

Id. at 204, 79 S. Ct. at 179-80 (citations omitted). Similarly, in Pierson v. Ray, 386 U.S. 547, 558, 87 S. Ct. 1213, 1219-20 (1967), the Court did not think that damages under 42 U.S.C. sec. 1983 were foreclosed to a group of white and black clergymen who were arrested after they attempted to integrate a bus terminal in Jackson, Mississippi, notwithstanding that the plaintiffs' purpose in entering the terminal had been to test their rights to unsegregated public accommodations. "The petitioners had the right to use the waiting room of the Jackson bus terminal, and their deliberate exercise of that right in a peaceful, orderly, and inoffensive manner does not disqualify them from seeking damages under sec. 1983." Id. at 558, 87 S. Ct. at 1220. The Third Circuit in Meyers, 559 F.2d at 898, and the Eleventh Circuit in Watts, 758 F.2d at 1485, both relied heavily on Evers and Pierson in concluding that testers have standing to bring suit under section 1982.

These two cases cannot bear the full weight of the plaintiffs' burden on standing, however. Evers makes clear that a plaintiff's status as a tester does not render a controversy illusory. And Pierson confirms that a tester can suffer a cognizable and compensable injury even if she seeks to exercise her rights with the full expectation that the defendant will violate them. Yet, as with Havens, what distinguishes these cases from the one at hand is the nature of the right involved. When a person pays her fare and

boards a bus, or orders a meal in a restaurant, she is actually using (or attempting to use) those public accommodations irrespective of her reasons for doing so; in a contractual sense, she actually is attempting to enter into a contract. Therefore, when she is evicted or arrested for refusing to honor a racial barrier, she suffers a deprivation of her rights whether she was present to ferret out discriminatory practices or because she genuinely needed a ride or a meal. See Pierson, 386 U.S. at 558, 87 S. Ct. at 1220; see also Smith v. Y.M.C.A. of Montgomery, Inc., 462 F.2d 634, 645-46 (5th Cir. 1972). Kyles and Pierce would be similarly situated if they actually wanted a job with Guardian (for whatever reason). But when someone solicits an offer of employment with absolutely no intent to accept in the event one is extended to her, she is not attempting to exercise the particular right protected by section 1981. She has no interest in forming a contract; to put it in Evers' context, she would never set foot on the bus. It is for that reason that a tester who encounters race discrimination in the process of applying for employment cannot sue under section 1981. The discrimination may be altogether real, and the tester may have suffered an identifiable injury; but the employer has not deprived the tester of her right to make or enforce contracts. The tester's injury, if any, is one that lies outside the zone of interests that section 1981 protects. See Morris v. Office Max, Inc., 89 F.3d 411, 414-15 (7th Cir. 1996).

   Congress, as we have emphasized throughout our analysis, has the power to define the right more broadly, and in so doing to bestow standing on a larger class of individuals. If, in section 1981, it had proscribed practices that would deprive or tend to deprive any individual of the opportunity to make a contract, for example, then testers might have standing to sue under this statute as they do under Title VII. See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1138 (9th Cir. 2000). But, in view of the more confined reach of section 1981 as Congress actually did frame it, we do not believe that Kyles and Pierce meet the criteria that Article III imposes.

IV.

   Having concluded that employment testers have standing to sue under Title VII but not section 1981, we AFFIRM IN PART and REVERSE IN PART the district court's judgment, and we REMAND the case to the court below for further proceedings consistent with this opinion. The parties shall bear their own costs of appeal. We thank both of the amici-- the EEOC, and the Fair Employment Council of Greater Washington--for their briefs; and we

commend all parties on the superior caliber of the briefing in this case.

/1 In the employment context, a "tester" is an individual who, without the intent to accept an offer of employment, poses as a job applicant in order to gather evidence of discriminatory hiring practices. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 370, 374, 102 S. Ct. 1114, 1119, 1121 (1982) (discussing housing testers).

/2 For example, the resume of the minority candidate might reflect superior work experience in terms of the length of her prior employment or the level of responsibility she enjoyed.

/3 The EEOC found "reasonable cause" to support their charges of race discrimination. R. 52 Exs. 7, 8. Efforts at conciliation were unsuccessful.

/4 See Biggus v. Southmark Mgmnt. Corp., No. 83 C 4024, 1985 WL 1751, at *2 (N.D. Ill. June 13, 1985) (Marshall, J.) ("It is not the plaintiff's intent in seeking the information, but rather the defendants'[intent] in making the allegedly false statement which is important in a sec. [804(d)] action.").

/5 Section 804(a) proscribes a variety of discriminatory housing practices. See 42 U.S.C. sec. 3604(a). The ban on refusals to sell or rent on the basis of race, etc. is the only clause of this subsection that includes the bona fide offer requirement. Consequently, the other activities addressed by subsection (a)--refusing to negotiate for the sale or rental of housing, making housing unavailable, and denying someone housing on the basis of race, etc.--are prohibited irrespective of whether there was a bona fide offer. That is why we concluded in Dwivedi that Havens' rationale as to tester standing extends to section 804(a) as well as the other subsections of the statute. 895 F.2d at 1527. See Grant v. Smith, 574 F.2d 252, 255 (5th Cir. 1978); Zuch v. Hussey, 394 F. Supp. 1028, 1050-51 (E.D. Mich. 1975), aff'd & remanded without published op., 547 F.2d 1168 (6th Cir. 1977); United States v. Youritan Constr. Co., 370 F. Supp. 643, 650 (N.D. Cal. 1973), aff'd in part & rev'd in part on other grounds, 509 F.2d 623 (9th Cir. 1975).

/6 In City of Chicago v. Matchmaker Real Estate Sales Center, Inc., supra, 982 F.2d 1086, the defendants were sued for racial steering under both the Fair Housing Act and section 1982. We held that testers do have standing to sue, but we

framed our holding in terms of the Fair Housing Act alone. See id. at 1095.

/7 Indeed, the Third Circuit indicated that it intended to address standing under both statutory provisions. See 559 F.2d at 898 ("we are required to review the district court's holding as it applies to sections 1981 and 1982"). However, as worded, the court's actual holding is limited to section 1982 alone. See id. ("We therefore hold that Meyers has standing to maintain his action under section 1982.").

/8 As our discussion makes plain, we are relying on BMC's rationale only insofar as it concerns the testers' lack of genuine interest in employment. We find it unnecessary to consider what impact, if any, the tester's presentation of fictitious credentials to an employer might have on her section 1981 claim.